## Case No. 15,581.

### UNITED STATES v. LEATHERS.

[6 Sawy. 17;[1] 11 Chi. Leg. News, 354.]

District Court, D. Nevada. July 1, 1879.[2]

INDIAN COUNTRY—RESERVATION—NEVADA—CRIMINAL INTENT.

1. The laws of the United States extending the laws regulating intercourse with Indian tribes over the tribes in Utah, Nevada at the time of their passage being a part of Utah, do not make Nevada Indian country.
[Cited in State v. M'Kenney, 2 Pac. 172.]

2. The tract of country called the "Pyramid Lake Indian Reservation" has been set apart by competent authority for the use of the Pah Utes and other Indians residing thereon. It is Indian

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court. Case unreported.]

country within the meaning of sections 2133 and 2139 of the Revised Statutes.
[Cited in U. S. v. Bridleman, 7 Fed. 903; U. S. v. Payne, 8 Fed. 888; U. S. v. Martin, 14 Fed. 821.]

3. Where the statute contains nothing requiring acts to be done knowingly, and the acts are not malum in se, nor infamous, but only wrong because prohibited, a criminal intent need not be proved. The offender is bound to know the law, and obey it, at his peril.

[This is an indictment against John Leathers.]

Charles S. Varian, for plaintiffs.
Robert M. Clarke, for defendant.

HILLYER, District Judge. This is a criminal case, in which the indictment charges the defendant with attempting to reside as a trader, and to introduce goods, and to trade in the Indian country, without a license, in violation of section 2133 of the Revised Statutes, and also with introducing liquor into the Indian country, contrary to section 2139. The indictment alleges this Indian country to be the Pyramid Lake Indian reservation.

Special issues of fact were by agreement of parties submitted to the jury, and the United States attorney now moves for judgment on the facts found by the jury. The questions in the case are: (1) Whether the now state of Nevada is Indian country in the sense of the sections above mentioned; (2) whether the tract of country called the "Pyramid Lake Indian Reservation" has ever been set apart by competent authority as an Indian reservation; (3) whether, admitting it is an Indian reservation, it is Indian country, in the sense of the laws of congress; and, (4) the jury having found the defendant's place of business to be outside the lines of the reservation as shown on the ground, by certain posts set up by the Indian agent and certain stone monuments set up by the surveyor, but within the limits as established by the executive order, whether the defendant is guilty of the offense charged.

Upon the first point it is argued, on behalf of the United States, that the whole state of Nevada is Indian country, by virtue of the Indian intercourse act of 1834 (4 Stat. 729), and section 7 of the appropriation act of 1851 (9 Stat. 587), which enacts "that all the laws now in force regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be, and the same are hereby extended over the Indian tribes, in the territories of New Mexico and Utah,"—Nevada, at that time being a part of Utah; and also by virtue of section 16 of the act of March 2, 1861, organizing the territory of Nevada, and section 11 of the act of March 21, 1864, enabling the people of Nevada to form a state, extending the laws of the United States not locally inapplicable over the territory and state of Nevada respectively.

It seems to me apparent that these enactments did not and do not make either the ter-

ritories of Utah or Nevada or the state of Nevada Indian country. The act of 1834, which, in 1850, contained nearly all the law regulating intercourse with Indians, defines the term "Indian country," and fixes its boundaries. Utah was not then a part of the United States, and did not become Indian country by the act of 1834. U. S. v. Tom, 1 Or. 26; U. S. v. Seveloff [Case No. 16,252].

The act of 1851, extending the laws regulating intercourse with Indian tribes over the Indian tribes in Utah, does not, in terms, certainly make Utah Indian country. Certain laws which before that enactment had been confined in their operations to the country described and designated as Indian country by those laws, were extended over the tribes in Utah. The provisions of law applicable to those tribes may be enforced without first being obliged to declare the territories in which those tribes live Indian country. The laws, too, are extended over the tribes and not over any specified territory. So that intercourse with those tribes is regulated even after the territory and state of Nevada has been set off from Utah. The general provisions extending the constitution and laws over Nevada, if they are to be regarded as extending the intercourse laws so far as applicable over the state, do not make it Indian country, but only give force to laws which before were confined to the Indian country as defined by congress.

In my judgment, then, Nevada is not Indian country. If, however, it is admitted to be such it would hardly be necessary to make any argument to show that the sections under which the defendant is prosecuted, are not applicable to the tribes in Nevada outside of the Indian reservations.

The defendant, in one count, is charged with attempting to reside and trade in the Indian country. If Nevada is Indian country, then every trader and every man who introduces goods here is liable to the penalty, unless he has a license from an Indian agent. This is, of course, absurd. The organization of the state and its admission into the Union require population. Congress has invited all citizens to explore the public mineral lands, and to make homes upon the agricultural lands. Traders must come with the rest, and goods must be introduced. It is the same as to the charge of introducing liquor into the Indian country. All over the state, dealers in spirituous liquors are licensed by the United States, and revenue thus collected. If Nevada is an Indian country, every liquor dealer therein is guilty of a violation of section 2139. It was argued that these sections were so far applicable here as trade with the Indian tribes themselves is concerned. But the answer is, that trading and introducing liquors into the Indian country are offenses which are complete without alleging or proving any dealing directly with the Indians.

We are next to determine whether the Pyramid Lake Indian reservation is legally an Indian reservation. It is said in behalf of the defendant that there is no law of congress setting it apart or giving the president authority to do so. The United States attorney claims that the reservation has been legally established by the following executive order inscribed upon a diagram purporting to be a map of the Pyramid Lake Indian reservation, viz.:

"Executive Mansion, March 23, 1874.

"It is hereby ordered that the tract of country known and occupied as the Pyramid Lake Indian reservation in Nevada, as surveyed by Eugene Monroe in January, 1865, and indicated by red lines according to the courses and distances given in tabular form on accompanying diagram, be withdrawn from sale or other disposition and set apart for the use of the Pah Ute and other Indians residing thereon.

"(Signed)                    U. S. Grant."

In Walcott v. Des Moines Co., 5 Wall. [72 U. S.] 681, it was held that land reserved from sale by the secretary of the interior for the special purpose of aiding in the improvement of the Des Moines river, and continued by the president and cabinet, was reserved by competent authority for that special purpose. The power of reserving lands is spoken of as a power which has been exercised ever since the establishment of the land department down to the present time.

In Grisar v. McDowell, 6 Wall. [73 U. S.] 363, the land in question had been exempted from sale and reserved for public purposes by an order of the president. The court say: "From an early period in the history of the government it has been the practice of the president to order lands to be reserved from sale and set apart for public purposes, and that numerous acts of congress recognized the authority of the president in this respect as competent authority. In that case the reservation was used for military purposes, but establishing a reservation for Indians is equally for a public purpose, and both these cases are authority in support of the legality of the president's order setting apart the reservation in question in this case."

No direct authority to the president to reserve lands and set them apart for public purposes is found in either case, but in each the president's authority is recognized by acts of congress which proceed upon the ground that he has it, and that the reservations so made are made by competent authority.

For instance, the act appropriating money for the Indian service in Nevada, in 1878, appropriates money for the support and civilization of Indians located on the Pyramid Lake reservation. 20 Stat. 85. The same provision occurs in 1879 (20 Stat. 314), congress thus recognizing the reservation in question by name

Again, in 1874, money is appropriated to assist the Indians in Nevada to locate in permanent abodes. By section 462 of the Revised Statutes the commissioner of Indian af-

fairs "shall, * * * agreeably to such regulations as the president may prescribe, have the management of all Indian affairs and all matters arising out of Indian relations." Again (section 465): "The president may prescribe such regulations as he may see fit for carrying into effect the various provisions of any act relating to Indian affairs."

Many other acts of congress might be cited of like tenor, but these show, it seems to me, enough to warrant and require the conclusion that the Pyramid Lake reservation has been established by competent authority.

The very extensive powers given to the president by sections 462–465 in the management of Indian affairs might well be held to include the power to establish a reservation if there were no other acts in relation to the matter. The authority given the president to set apart five military reservations for Indian purposes by the act of March 3, 1852, had especial reference to the Indians in California. 10 Stat. 238, 332, 699, and 13 Stat. 39. But were this not so, the repeated recognition by congress of the reservations established in Nevada by the president would be enough, along with the general powers given the president in Indian affairs to show his authority.

The third point made by the defendant is that if this be an Indian reservation it is not "Indian country," as that term is used in sections 2133 and 2139 of the Revised Statutes. It must be conceded that there is no act of congress making the reservation in terms "Indian country," and that it is not within the boundaries established by section 1 of the act of 1834.

A large portion of the act of 1834 is included in the Revised Statutes, but section 1, defining the boundaries of the Indian country, is not. The act of 1834 is therefore repealed by section 5596, Rev. St., and section 1, not being incorporated into the Revised Statutes, is repealed also, unless it is a provision of a "private, local, or temporary character," and so, by virtue of the proviso to section 5596, still in force.

Section 1 is in these words: "Be it enacted, that all that part of the United States west of the Mississippi and not within the states of Missouri and Louisiana or the territory of Arkansas, and also that part of the United States east of the Mississippi river and not within any state, to which the Indian title has not been extinguished for the purposes of this act, be taken and deemed to be the Indian country." 4 Stat. 729.

This is neither private nor temporary, certainly. Then is it local? The act of which it is a part is entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." This title indicates an act of a general and permanent character. and not local and temporary. Although the first section defines Indian country, it is not restricted in its operation to that locality. It is, it seems to me, a part of the general law applicable everywhere in the nation as a definition of Indian country.

The case of Bates v. Clark, 95 U. S. 204, arose before the adoption of the Revised Statutes, and before December 1, 1873, while section 1 of the act of 1834 was in force, and can not be regarded as recognizing the definition of Indian country in that statute as still a part of our law.

I consider that the provisions of section 1 of said act are not within the proviso of section 5596, Rev. St., and must therefore be considered as repealed. It seems to me that the changed condition of the region embraced in that definition of Indian country no doubt induced congress to leave it out as no longer applicable.

There is, then, if I am right in this, no longer any statutory definition of Indian country, and at the same time the term is retained in a number of important sections of the Revised Statutes, and the question is, to what does the term now apply, and does it include an Indian reservation?

As early as July 22, 1790 (1 Stat. 137), congress used the expression "Indian country" in the first act "to regulate trade and intercourse with Indian tribes." No definition of it is given, but the tenor of the act shows that it was used as meaning country belonging to the Indians, occupied by them, and to which the government recognized them as having some kind of title and right. In the next act of 1793 (1 Stat. 329), Indian country and Indian territory are used as synonymous. The act of 1796 fixed a line, according to Indian treaties, from Lake Erie down St. Mary's river, and speaks of the country over and beyond said boundary line as Indian country. 1 Stat. 459, § 16. The act of 1799 (1 Stat. 473) fixed same line and prescribed a penalty for crossing or going within the boundary line to hunt, etc., or driving stock to range on "any lands allotted or secured by treaty with the United States to any Indian tribes." The territory over the line is called "Indian country." In some sections territory belonging to Indians is spoken of. So the act of 1802 (2 Stat. 139) uses the words "Indian country" and "Indian territory" as meaning the same thing, and in both instances it is the country set apart by treaties or otherwise for the Indians,—lands to which the Indian title had not been extinguished. By the act of 1816 [3 Stat. 333], foreigners are excluded from any country allotted to Indian tribes secured to them by treaty, or to which the Indian title has not been extinguished. By the act of 1822 (3 Stat. 682), the president was authorized to cause to be searched the packages of traders suspected of carrying ardent spirits into the Indian countries, in the plural. Next comes the act of 1834, defining Indian country particularly in its first section. Section 9 of the appropriation act of March 3, 1865 (13 Stat. 563), authorizes certain agents residing in said terri-

tory to sell cattle for the tribes under certain regulations. The context shows that by "Indian territory" is meant the country south of Kansas known by that name.

When this section is incorporated into the Revised Statutes, it is the same except the words "Indian territory" have become "Indian country." In section 8. making it a felony to drive cattle out of the Indian Territory, the same change occurs. Rev. St. §§ 2127–2138. Chapter 4, tit. 28, Rev. St., is headed "Government of Indian Country" (not the Indian country). In the act of 1863 (12 Stat. 793) this occurs: Treaties may be made with tribes residing in the country south of Kansas and west of Arkansas, commonly known as the Indian country. In Nevada there are four tribes of Indians, the Pah Utes, Shoshones, Washoes, and Goshutes. So far as I can discover, no formal written treaties have ever been made with any of these, except the Shoshones (18 Stat. 689), and in that there is no cession of Indian title, though there is a sort of recognition of some right to the soil in the Indians. Section 2 of the act of 1856 (11 Stat. 80), provides that if any person removed from the Indian country shall return or be found in the Indian territory, etc. In section 2148, Rev. St., "Indian territory" is changed to "Indian country."

Reference to these various statutes in which the words "Indian country" and "Indian territory" have been used, is made that it may be seen in what senses congress has used the words before the revision of the statutes. The act of 1834, as interpreted in Bates v. Clark, fixed plainly the boundaries of Indian country. But in this case the Revised Statutes must control, and in them there is no definition of Indian country. What led to the omission of section 1 of the act of 1834 from the Revised Statutes was no doubt the consideration that it was no longer applicable to the present state of things,—was, in fact, obsolete. From the earliest period of our history the boundaries of the Indian country have been narrowing. It has been done by the encroachments of the white races. For many years, up to March, 1871, the policy of the United States had been to make treaties with the various Indian tribes, and in them to adjust the claims of the various tribes to the soil, extinguish the Indian title to the same, and set apart tracts of country by metes and bounds for the exclusive occupation of the tribe making the treaty. In some instances, as in case of the Cherokees, Creeks, Choctaws, etc., the tribe acquired a fee-simple title to the lands set off to them, except that it reverted to the United States whenever the tribe should become extinct.

The policy has been to separate the Indian tribes from the rest of the people, and to set apart for their exclusive use specific portions of the public domain. The statutes cited show that "Indian country" is the term used generally to describe country in the occupation of the Indians, to which their title or right of occupancy—a right always hitherto recognized by the United States—has not been extinguished.

At the time the Revised Statutes were adopted, all the country, except the Indian Territory proper, embraced by the definition of Indian country in the act of 1834, was organized into states and territories, to which the world generally was invited to come and settle. The same was true of all that portion of the United States lying west of the Rocky mountains. So far as I can ascertain, all the tribes, certainly all the tribes of note, within this vast territory, have been, either by treaties or agreement, dealt with by the government. The tribes, in consideration of money, goods, annuities, etc., have ceded their right to the occupation of the regions over which they had been roaming and hunting, and have had a specific portion of land or territory, or country allotted to them for their exclusive use, called Indian reservations. On these it was, and is, the policy, so far as possible to induce the tribes to settle permanently and cultivate the soil as a means of living, in lieu of their former roaming life, hunting and fishing.

This is the general situation of Indian affairs. It follows that unless these various Indian reservations are Indian country, and if we are still bound by the definition in the act of 1834, there is little or no country to which the various sections of the Revised Statutes for the government of the Indian country can apply. But if we regard section 1 of the act of 1834 as repealed, and these portions of the public lands allotted to the use and occupation of the Indians as Indian country, the sections of the Revised Statutes in which those words occur will have such operation as to carry out what I think congress intended should be accomplished by their adoption. It is as important now as ever that the introduction of liquor into the reservations set apart for the Indians should be prevented, and trading and settling among them also. I am constrained to adopt this as the true construction of the present law, and therefore hold the Pyramid Lake Indian reservation to be Indian country.

The remaining question relates to the finding of the jury, that the defendant's place, though within the red line on the map, is without the monuments put up by Monroe, the surveyor, and outside of the posts set up by order of the Indian agent, Bateman.

The true result of the verdict of the jury is to establish the trading post of the defendant a half mile or more within the reservation. The language of the executive order on the map is such that the courses and distances mentioned must control. They are on the map. and a part of the order, so that the boundaries of the reservation are those courses and distances as indicated by the red lines on the diagram or map.

No reference is made in the order to either natural or artificial boundaries, and, therefore, neither the monument nor the wooden posts can control the courses and distances. The survey was made by triangulation, and the monuments were set upon mountain peaks for the most part. These are at the angles of the survey, and where they are not marked by a stone monument, a peak itself is the substitute.

At one time, by Bateman's order, he being Indian agent at the time, one Fraser set up a line of wooden posts marked "Pyramid Lake Indian Reservation." Fraser said he was told to put them up as near the line as he could. The defendant's place being, in fact, within the reservation, the only bearing these facts—that he was outside the line as shown by the monuments and posts—can have, is in regard to his intent.

I take it for granted that the defendant thought he was outside the reservation line, and that he came to this conclusion because of the posts, and the line as it appeared to be marked by the mountain peaks.

The act of the Indian agent, or his subordinate, Fraser, in setting up the posts, was, so far as fixing a boundary line of the reservation is concerned, beyond the scope of the authority of either, and, of course, so far void, and in no way binding the government, by estoppel in pais, or otherwise.

The defendant is charged with trading in the Indian country in one count, and with introducing liquors there contrary to the statutes of the United States in another. The statute contains nothing requiring these acts to be done knowingly. The acts themselves are not malum in se. The object of the law is not to punish men for these acts as crimes, so much as to prevent trading and intercourse with the Indians otherwise than as the law permits. There is nothing infamous in the punishment prescribed. Under these circumstances, I think it is immaterial with what intent the acts were done. They belong to that class of acts which, in the absence of the statute, might be done without culpability (3 Greenl. Ev. § 21), and being, such ignorance of the lines of the reservation will not excuse, nor will a sincere belief by the defendant that he is outside the lines. He is bound to know the facts and obey the law at his peril. Id.; Reg. v. Woodrow, 15 Mees. & W. 404; Attorney General v. Lockwood, 9 Mees. & W. 378; 1 Bish. Cr. Law (4th Ed.) 1031, etc.

In the case of U. S. v. Anthony [Case No. 14,459], the defendant was charged with illegal voting. The case was tried by Mr. Justice Hunt, and although it appeared that the defendant sincerely believed she had a right to vote, it was held that this did not excuse her. So, on the trial of the inspectors of election for receiving her vote, they proved their good faith, but their ignorance of the want of proper qualifications was held to be no excuse. Cited in Whart. Cr. Law, § 82.

In the case of Com. v. Mash, 7 Metc. (Mass.) 472, a woman who honestly believed her first husband to be dead was convicted of bigamy, he not being in fact dead when she married a second man. In this case sentence was reserved and a full pardon obtained. The same doctrine is maintained in England. 3 Whart. 84. So in State v. Ruhl, 8 Iowa, 447, the defendant was not allowed to prove that he believed, or had good reason to believe, the girl he enticed away was over fifteen, the law confining the offense to girls under that age. The same principle was asserted in Reg. v. Olifier. 10 Cox, Cr. Cas. 402, one judge saying a man dealt with the girl at his peril, and that it made no difference that the girl told him she was over sixteen.

The following cases are cited in section 8, 3 Whart, Cr. Law: It is no defense to an indictment for voting without the proper qualifications, that the defendant believed he had them. No matter how honest his belief is, unless the statute excepts cases of honest belief. To an indictment for publishing a libel it is no defense that the defendant did not know of the publication. Nor to one for selling liquors to a minor, that the defendant believed the vendee to be of full age. Nor to one for abduction, that the motives were philanthropic, or that the defendant mistook the girl's age.

In this class of cases the offending party is subjected to the penalty for the act done irrespective of his intent, as in civil cases he is required to answer for an act which injures another, however innocent of intentional wrong he may be. My conclusion is, that defendant must be adjudged guilty on both counts. The belief of the defendant in connection with the acts of government agents in setting up the posts can only be considered to determine whether a prosecution shall be begun in the first place, or the degree of punishment in case of conviction, or as ground for a pardon or remission of the forfeitures and penalties.

The defendant, Leathers, is, therefore, adjudged guilty of the offenses charged, and will appear for sentence.

Affirmed on appeal to the circuit court. [Case unreported.]