*L. C. Rockwell*, for plaintiff.

*W. S. Decker*, and *D. P. Dyer*, for defendants.

---

## THE UNITED STATES *v.* BERRY *et al.*

### (*U. S. District Court, District of Colorado, Nov. 8, 1880.*)

A COMMISSIONER OF A COURT IS NOT A SEPARATE TRIBUNAL. HIS FUNCTIONS AS AN EXAMINING MAGISTRATE ARE ONLY MINISTERIAL, NOT JUDICIAL. A commissioner is but the officer of the court, to whom is committed duties which must otherwise be performed by the court itself. In all he does he is not a separate tribunal, but an arm of the court to execute preliminary work. As an examining magistrate his functions are ministerial, not judicial.

WRIT OF PROHIBITION is never employed to control the conduct of a mere officer of the court; but the court may, whenever justice requires it, assume control of proceedings before its commissioner.

QUESTION OF JURISDICTION. HOW RAISED ON PRELIMINARY EXAMINATION. The defendants being before the commissioner of the United States Court charged with crime, and the attorney general of the state having filed his suggestion denying the jurisdiction of the Federal Government, it is proper for the court to take charge of the investigation, and to this end will direct the commissioner to certify the proceedings.

TREATIES WITH INDIANS have the force of law, and when entered into while the reservation is embraced in a territory, are not repealed by implication, by the passage of an act authorizing the formation of a state government.

JURISDICTION TO PUNISH CRIME WITHIN INDIAN RESERVATION REMAINS IN THE UNITED STATES COURT, THOUGH THE RESERVATION LIES WITHIN A STATE. Where a district of country has been, by competent authority, set apart as an Indian reservation, and by treaty stipulation the United States have assumed exclusive jurisdiction over it, such district remains an Indian reservation, the federal jurisdiction over it continues until it is changed by act of Congress or by treaty, or until the Indian title is extinguished; and this notwithstanding it may be embraced within the limits of a state. This exclusive jurisdiction extends to and embraces the enforcement of the criminal laws.

THE UTE RESERVATION, though within the state of Colorado, having been set apart as such by treaty, and the exclusive jurisdiction to punish crime therein being by the terms of the treaty vested in the United States, and this treaty not being, in terms, repealed by act of Congress, the treaty

remains in force as the law; and the United States District Court has the exclusive jurisdiction to try and punish offenders for crimes committed within the reservation.

The defendants being in the custody of the United States marshal, under a warrant issued by a commissioner of the United States Circuit Court, upon a charge of murder alleged to have been committed on an Indian reservation, the attorney general of the state filed a written suggestion, setting forth that the offense charged, if committed, was within the state of Colorado, and that warrants for the arrest of the accused, on the same charge, had been issued by an officer of the state, which could not be executed because the accused parties were held by the United States authorities for examination before a commissioner of the District Court. Claiming for the court exclusive jurisdiction, he moved the court to award a writ of prohibition to prevent the commissioner from proceeding with the examination. The court held:

HALLETT, J.   Three persons, charged with homicide, committed on an Indian reservation, are held by the marshal under a warrant issued by a circuit court commissioner to answer for that crime. It seems that the commissioner assumes jurisdiction to act in the premises on the ground that the place of the alleged crime is within the sole and exclusive jurisdiction of the United States. Denying that proposition and affirming that the place where the crime is said to have been committed is within the criminal jurisdiction of the state, the attorney general of the state suggests to the court that the proceedings of the commissioner are without authority, and he prays that *prohibition* may issue to arrest them in order that the state may proceed against the offenders. In support of the application it is assumed that in making inquiry as to violations of the laws of the United States, a commissioner may be regarded as holding an inferior court, over which this court having cognizance of the crimes themselves, may have supervisory jurisdiction. But this appears to be founded on an erroneous view of the relations of those officers to this court. For it is plain that commissioners are but officers of the court to whom are committed some of the duties which must otherwise be performed by the court itself, or the judge thereof. The exigencies of the public service demand that speedy inquiry shall be made into all criminal charges, in order that offenders may be

brought to justice. And as from the press of business or remoteness from the place where the crime may be committed, or other cause, the court cannot always, or ordinarily, perform that service, commissioners are appointed to facilitate the business. In all that they do they are not separate and independent tribunals, but the arms of the court to execute the preliminary work of securing the presence of offenders at the time appointed for arraignment and trial. Indeed they are not, and under the constitution they cannot be clothed with judicial power to hear and finally determine any matter whatsoever. Their duties relate only to the detention of the accused, until the charge against him may be formally presented to the court and constitutionally tried. In that they are not bound to hear more than the evidence of the government, and they do not finally determine any question touching the guilt or innocence of the accused. Accordingly, it is said in the books that the function of an examining magistrate is ministerial and not judicial. 1 Bishops Crim. Pro., Sec. 237. And upon this consideration alone the writ of prohibition to control the conduct of a commissioner, must be denied. High's Remedies, Sec. 769.

But in a broader view of the nature and extent of his office, it will be apparent that a commissioner is an officer of the court merely, as to whom the writ of prohibition is never employed.

It does not, however, follow from this course of reasoning that the court has no control over the proceedings of a commissioner when acting as an examining magistrate; on the contrary, if in the discharge of such duty a commissioner is an officer of the court, it would seem to be proper in the court to assume control of the proceedings whenever justice may require that it should be done. In important cases it is familiar practice for the judges of superior courts having cognizance of criminal offenses to sit as examining magistrates; and after commitment the proceedings of magistrates are often reviewed on *habeas corpus* and *certiorari*, in the court having cognizance of the crime.

In that way the courts do but assume control in the preliminary stages of matters of which they have the final decision under the law, and no argument can be necessary to support them in a practice which so clearly tends to further the ends of justice. I do not doubt the authority of the court to take charge of these proceedings, and as the attorney general of the state has come

here to deny the jurisdiction of the Federal Government, that course will be adopted. The commissioner will be directed to certify his proceedings into this court, to the end that we may consider here what may be alleged against them.

The commissioner having certified the papers, pursuant to the foregoing ruling, and the question of jurisdiction having been heard, in the United States Circuit Court, by consent, on the 19th of November the opinion of the court was delivered, as follows:

McCRARY, C. J. It is alleged that on the twenty-seventh day of September, 1880, the crime of murder was committed within the district of country set apart by treaty of March 2, 1868, between the United States and the several bands of the Ute tribe of Indians (15 Stat., 619,) and W. H. Berry and S. N. Hoyt are accused of said crime. The United States claim jurisdiction of the offense on the ground that the murder charged was committed in a place within their exclusive jurisdiction, and in accordance with that claim, the accused have been arrested upon information filed before a commissioner of this court, before whom their cases have been partially examined, and in whose custody they remain, awaiting further proceedings.

The state of Colorado also claims that it has exclusive jurisdiction of the offense charged, upon the ground that the murder was committed within the territorial limits of that state, and in a place within its exclusive jurisdiction, and by an information filed herein by the attorney-general of the state, this court is requested to order that the pending proceedings before said commissioner be discontinued, and that the prisoners be turned over to the authorities of the state for trial.

The sole question for our consideration is, was the murder committed in a place within the exclusive jurisdiction of the United States, for if it was not, the federal jurisdiction cannot be maintained.

Section 5339 of the Revised Statutes of the United States provides that every person who commits murder:

*First*—Within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States    *    *    *    shall suffer death.

Section 711 provides that the jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several states, *first*, of all crimes and offenses cognizable under the authority of the United States,     *     *     *     *     *

Section 2145, which is found under the title "Indians," provides as follows: "Except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

The punishment of the crime of murder is nowhere expressly provided for in said title, and it follows that where that crime is committed in the Indian country, it is within the exclusive jurisdiction of the United States.

The question what territory is included within the term Indian country, as employed in section 2145 above quoted, is one not free from difficulty. The act entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the borders," approved June 3, 1834, (4 Stat. at Large, 729,) provides that "all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, also that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country."

The Ute reservation of Colorado is not within the territory here described. It was not at the time of the passage of that act a part of the United States, but was subsequently acquired from Mexico. It was originally embraced within the territorial limits of the territory of Utah. 9 Stat., 453.

By section 7 of the act of Congress of February 27, 1851, (9 Stat., 587,) it is provided "that all the laws now in force, regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be, and the same are hereby extended over the Indian tribes in the territories of New Mexico and Utah." Whether the effect of this provision was to make New Mexico and Utah, including what is now the Ute reservation of Colorado, Indian country, is to my mind quite

doubtful. It is, however, not necessary to decide that question, since it is perfectly clear that by virtue of the treaty-making power, the United States had, prior to the organization and admission into the Union of the state of Colorado, brought the Ute reservation above named within their sole and exclusive jurisdiction, and no doubt whatever is entertained that the federal courts had, prior to the admission of said state of Colorado, complete jurisdiction to hear, try and determine all cases of murder committed within the limits of that reservation. The determination of this case must turn upon the question whether the United States were ousted of their jurisdiction over the said reservation by the provisions of the act entitled "An act to enable the people of Colorado to form a constitution and state government," etc., approved March 3, 1875, (18 Stat., p. 474). The decision of this question will require the consideration and construction of the said enabling act, in connection with the provisions of the treaty between the United States and the several bands of Ute Indians, proclaimed March 2, 1868. The first section of the enabling act above cited provides "that the inhabitants of the territory of Colorado included in the boundaries hereinafter designated be, and they are hereby authorized to form for themselves out of said territory a state government, with the name of the state of Colorado, which state, when formed, shall be admitted into the Union upon an equal footing with the original states in all respects whatsoever, as hereinafter provided."

The treaty which was in force prior to the passage of said enabling act, contains the following provisions:

"ARTICLE 2. The United States agree that the following district of country, to wit: Commencing at that point on the southern boundary line of the territory of Colorado where the meridian of longitude 107 degrees west from Greenwich, crosses the same, running thence north with said meridian to a point fifteen miles due north of where said meridian intersects the fortieth parallel of north latitude, thence due west to the western boundary line of said territory, thence south with said western boundary line of said territory, to the southern boundary line of said territory, thence east with said southern boundary line to the place of beginning, shall be, and the same is hereby, set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as,

from time to time, they may be willing, with the consent of the United States, to admit among them—and the United States now solemnly agree that no persons, except those herein authorized so to do, and except such officers, agents and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall *ever* be permitted to pass over, settle upon, or reside in the territory described in this article, except as herein otherwise provided.

"ARTICLE 6. If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained. If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the tribes herein named solemnly agree that they will, on proof made to their agent and notice to him, deliver up the wrongdoer to the United States to be tried and punished according to its laws, and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

"ARTICLE 7. *     *     *     * The President may at any time order a survey of the reservation, and, when so surveyed, Congress shall provide for protecting the rights of such Indian settlers in their improvements, and may fix the character of the title held by each.

"The United States may pass such laws on the subject of alienation and descent of property, and on all subjects connected with the government of the Indians on said reservation, and the internal police thereof, as may be thought proper."

According to a well settled rule of construction, since there is no express repeal of any part of the treaty, that instrument and the statute should be construed together, and as far as possible, the provisions of each should be allowed to stand.

An express law conferring certain special rights and privileges is held never to be repealed by implication, unless the intent to effect such repeal be clear. *State* v. *Brannan*, 3 Zabriskie, 484; *State* v. *Minton*, *Ibid*, 529. And the doctrine is supported by numerous other authorities.

We are assisted somewhat in the construction of the enabling act, in so far as it bears upon the question now before us, by reference to a subsequent act of Congress entitled "An act to further the administration of justice in the state of Colorado," approved June 26, 1876 (19 Stat., 61), which provides, among other things, "That when the state of Colorado shall be admitted into the Union, according to the provisions of the act entitled 'An act to enable the people of Colorado to form a constitution and state government, and for the admission of said state into the Union on an equal footing with the original states,' approved March 3, 1875, the laws of the United States not locally inapplicable, shall have the same force and effect within the state as elsewhere within the United States."

That the treaty above named was a law of the United States is well settled by numerous decisions of the Supreme Court. *Harkness* v. *Hyde*, 98 U. S., 476; *United States* v. *43 gallons whisky*, etc., 93 U. S., 188; *Worcester* v. *State of Georgia*, 6 Pet., 515; *The Cherokee Tobacco Case*, 11 Wall., 616.

It may be added, that Congress has recognized the obligation of all treaties with the Indian tribes lawfully made and ratified prior to March 3, 1871. Revised Statutes, 2079. And by numerous legislative provisions, and by many acts of appropriation, Congress has recognized all such treaties as having the force of law. See Revised Statutes, sections 2080, 2081, 2093, 2094, 2095, 2096, 2097, 2099, 2100, 2101, 2116, 2118. If I am right in the conclusion that the treaty above named was one of the laws of the United States, which by the terms of the act of Congress of June 26, 1876, was to remain in force in said state of Colorado, after its admission into the Union, then it follows that the Ute reservation remains within the exclusive jurisdiction of the United States by virtue of said treaty.

But without resting upon this proposition, let us inquire whether the enabling act upon its face ought to be construed as repealing the treaty of March 2, 1868, and as therefore depriving the United States of the power of fulfilling the solemn obligations imposed

upon them by said treaty.   Among the provisions of said treaty is one which declares that the United States "now solemnly agree that no persons except those herein authorized so to do, and except such officers, agents and employés of the government as may be authorized to enter upon said Indian reservation in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon or reside in the territory described in this article, except as herein otherwise provided.   Article 2.

Another provision of the treaty declares that "if bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent, and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained."   Article 6.

The same article further provides for the punishment, according to the laws of the United States, of any person among the Indians, who shall commit a wrong or depredation upon the person or property of any one, white, black or Indians, subject to the authority of the United States, and at peace therewith.

Another provision declares that Congress shall provide for protecting the rights of Indian settlers, in their improvements, and may fix the character of the title held by each.   And still another declares that the United States may pass such laws on the subject of alienation and descent of property, and on subjects connected with the government of the Indians on said reservation, and the internal police thereof, as may be thought proper. All these and many other provisions of the treaty necessarily require for their enforcement that the reservation shall remain under the sole and exclusive jurisdiction of the United States. Indeed, to hold that the jurisdiction of the United States over said reservation is superseded by that of the state, would be to render nugatory nearly every provision of the treaty.   When we remember that the policy of keeping the Indian reservations within the exclusive jurisdiction of the national government, until such time as the rights of the Indians therein are extinguished by treaty, has been uniformly pursued with respect to all the Indian reservations in the country, and is expressed so

plainly in the provisions of the treaty above named, it is impossible to suppose that it was the intention of Congress by the organization of the state of Colorado to annihilate the treaty, and to deprive the Indians of their right to protection under it. Where a district of country has been by competent authority set apart as an Indian reservation, and by treaty stipulation the United States have assumed exclusive jurisdiction over it, such district remains an Indian reservation, and the federal jurisdiction over it continues, until it is changed by act of Congress, or by treaty, or until the Indian title is extinguished, and this, notwithstanding it may be embraced within the limits of a state. *Bates* v. *Clark*, 5 Otto, 204. The treaty by its terms was to be permanent, and the rights conferred thereby were not to be taken away without the consent of the Indians. It may be conceded that it is within the power of Congress to repeal it, but it is clear to my mind that such repeal can only be enacted in express terms, or by such language as imports a clear purpose on the part of Congress to effect that end.

To hold the treaty abrogated by the subsequent legislation would be to assume that Congress intended to depart in this instance altogether from the policy of treating the Indians as wards of the nation, of keeping them and the lands set apart for their use and occupation within the sole jurisdiction of the United States, and that it intended to turn this particular tribe with its reservation over to the jurisdiction and control of the state of Colorado, stripped of its treaty rights, and deprived of the powerful protection of the national government. Such a purpose ought to have been very clearly expressed.

If it be said that the state may have jurisdiction within the limits of the reservation for the purpose of enforcing its criminal laws, without interfering with the rights of the Indians under the treaty, the answer is that one of the obligations imposed upon the United States by the plain terms of the treaty, is to enforce their own criminal laws against all classes of offenders within the bounds of the reservation. Furthermore, it is manifest that if the enabling act repeals the treaty for one purpose, it repeals it for all purposes. If the state has jurisdiction over any part of the territory and people of the reservation for the purpose of enforcing its criminal laws, it has jurisdiction over the whole of the territory, and over all the people, whether whites, blacks or Indians. If

the jurisdiction now claimed by the state be conceded, then it follows that the state may not only enforce such criminal laws as now exists on its statute books, as against all persons residing or found upon the reservation, but it may enact other laws, if it so wills, in direct conflict with the rights guaranteed to the Indians by treaty, as well as destructive of the policy of Congress with respect to that people.

This is precisely what the state of Georgia attempted to do in 1829 with respect to the reservation of the Cherokee nation, which was within the limits of that state. But the Supreme Court of the United States held in the case of *Worcester* v. *The State of Georgia, supra*, that the state legislation was void because in conflict with a treaty with the Cherokee Indians, which was held to be the supreme law of the land. In that celebrated case, Chief Justice Marshall said:

"The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense."

An examination of the history of Congressional legislation concerning Indian affairs from the formation of the government down to the present time, will show a continuous and consistent policy of national supervision, care and protection. Numerous reservations have been from time to time set apart for their use, and so far as I know, every one of these has been kept within the jurisdiction of the United States, whether located in a territory or in a state, until such time as the Indian title has been extinguished or the tribe has forfeited or voluntarily given up its rights. No case is known to me in which a tribe of Indians with its reservation has been turned over, without its consent, to the jurisdiction of any state. I am unable to believe that Congress has in this instance with respect to a single tribe and a particular reservation departed from this policy.

The case of *The Cherokee Tobacco*, 11 Wall., 616, presented, in the opinion of a majority of the judges who took part in the decision, an example of clear and necessary repugnancy between an act of Congress and a pre-existing Indian treaty, and therefore one in which the latter repealed the former by necessary implication.   The act of Congress by express terms extended the internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff and cigars, "to such articles produced anywhere *within the exterior boundaries of the United States*, whether the same be within a collection district or not."

The previous treaty with the Cherokee Indians exempted from taxation "any merchandise or manufactured products" of the Cherokees, except such taxes as might "be levied by the United States on the quantity sold outside of the Indian territory." It would seem impossible to reconcile the conflict between the two, since the words "any place within the exterior boundaries of the United States" employed by Congress in the statute, manifestly included the Indian territory.   And yet the fact that Mr. Justice Bradley and Mr. Justice Davis dissented, serves to show the reluctance with which courts yield, even in clear cases, to the doctrine of repeals by implication.

Assuming, however, the soundness of the opinion of the majority in that case (as we are of course bound to do), let us consider whether it applies to the case now in hand.   To make the two cases parallel, it would be necessary to show that Congress, in the Colorado enabling act, expressly declared that jurisdiction of the state of Colorado for the purpose of enforcing its criminal laws, shall extend to all the territory within the exterior boundaries of said state.   Such language would, according to the doctrine of the case just cited, have repealed by necessary implication so much of the pre-existing treaty as placed the Ute reservation within the jurisdiction of the United States.   But no such language is employed by Congress in the enabling act. Nothing is said about the jurisdiction of the state over the territory within its boundaries.   The people of the territory were to form for themselves a state government which was to be admitted into the Union on an equal footing with the original states.   Does it necessarily and invariably follow from this language that the state should exercise jurisdiction over every foot of territory within its boundaries?   I think not.   The language is general,

23

and is not necessarily in conflict with an exception in a special case created by some previous law.

Suppose, for example, that the United States had, prior to the admission of the state, reserved for its own use for military purposes a portion of the territory embraced within the limits of the state as subsequently organized, and that the same had been set apart by law for that purpose. Will it be contended that such a reservation would have passed by virtue of the general terms of the enabling act into the exclusive jurisdiction of the state? If not, we see at once that the general language of the enabling act may admit of some exceptional special cases. Its language is broad and comprehensive, and is sufficient to confer jurisdiction upon the state government over all its territory, unless by express enactment jurisdiction over some part of that territory, for some special purpose, had been previously retained by, or vested in the United States. There is probably no state in the Union which does not contain more or less territory which is within the sole and exclusive jurisdiction of the United States. Lands held for military or naval purposes, or for the use of the post office, or for the courts, as well as such as are held for Indian reservations, are examples. Where such lands are taken after the formation of a state government, it has generally been deemed necessary, or at least expedient, to obtain from the state a relinquishment of jurisdiction; but where jurisdiction over them is vested in the United States, prior to the organization of the state government, this is not necessary.

My conclusion is, that the treaty of March 2, 1868, remains in full force, and has not been repealed—that by virtue of its terms the Ute reservation is within the jurisdiction of the United States, and that the federal courts of this district have jurisdiction of the case stated in the information.

The order prayed is accordingly denied.

HALLETT, District Judge, concurs.

*C. W. Wright*, Attorney General, for the state.

*E. L. Johnson*, U. S. District Attorney, for the government.

*B. M. Hughes, S. E. Browne, T. M. Patterson, T. Macon*, for defendants.