UNITED STATES *v.* BRIDLEMAN.

*(District Court, D. Oregon.  July 15, 1881.)*

1. LARCENY OF INDIAN PROPERTY.

The Indian intercourse act of June 30, 1834, (4 St. 729,) was extended over Oregon, so far as the same was applicable thereto, by act of June 5, 1850, (9 St. 437.)  *Held,* that the provision of said act of 1834, providing for the punishment of a white man for stealing the property of an Indian, and *vice versa,* was applicable to Oregon, and thereafter in force there; and that the same was not modified or repealed by the admission of the state into the Union, February 14, 1859.  11 St. 383.

2. UMATILLA RESERVATION AN INDIAN COUNTRY.

The treaty of June 9, 1855, (12 St. 445,) establishing the Umatilla reservation for the exclusive use of certain Indian tribes, was not modified or repealed by the act admitting Oregon into the Union, and from the date of such treaty, and by reason thereof, such reservation was and is "Indian country," and all laws for the punishment of crimes committed in such country are applicable thereto, and may be enforced in the United States courts for the district of Oregon.

3. INTERCOURSE WITH THE INDIAN TRIBES.

The power of congress to regulate the intercourse between the inhabitants of the United States and the Indian tribes therein, is not limited by state lines or governments, but may be exercised and enforced wherever the subject—Indian tribes—exists.

*Rufus Mallory,* for the United States.

*The defendant,* in person.

DEADY, D. J.  On July 7, 1881, an information was filed in this court by the district attorney charging the defendant with the larceny of a blanket from an Indian on the Umatilla Indian reservation in this district.  The defendant pleaded not guilty, and the case was submitted to the court upon an

agreed state of facts, to stand as and for a special verdict, as follows:

On July 1, 1881, the defendant, a white man, feloniously took and carried away from the Umatilla Indian reservation in the district of Oregon, then under charge of an Indian agent, a blanket of the value of two dollars, the same being then and there the property of Shick-Shuck, an Indian, then belonging to and living upon said reservation, with a prayer for judgment by the defendant on the ground that the court had no jurisdiction of the offence charged.

Section 25 of the act of June 30, 1834, (3 St. 733,) "to regulate trade and intercourse with the Indian tribes," as modified by sections 2145 and 2146 of the Revised Statutes, enacts as follows:

"That so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall be in force in the Indian country: *provided,* the same shall not extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offence in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offences is, or may be, secured to the Indian tribes respectively."

And section 5356 of the Revised Statutes enacts as follows:

"Every person who, ＊ ＊ ＊ in any place under the exclusive jurisdiction of the United States, takes and carries away, with intent to steal or purloin, the personal goods of another, shall be punished by a fine of not more than $1,000, or by imprisonment not more than one year, or by both such fine and imprisonment."

It is decided, so far as this court is concerned, that the phrase "Indian country," as used in act of 1834, *supra,* is a technical one, and only applies to such portions of the United States as are described in the first section thereof, or have since become such by and in pursuance of an act of congress, or a treaty of the United States, and that it does not extend or apply to any country simply because it is owned or inhabited by Indians in whole or in part; and also that said act was local, and only extended west to the Rocky mount-

ains, and was never extended beyond them, *proprio vigore*, or otherwise, than as specially provided by act of congress. *U. S.* v. *Tom*, 1 Or. 27; *U. S.* v. *Saxaloff*, 2 Saw. 311.

By section 5 of the act of June 5, 1850, (9 St. 437,) to authorize "the negotiation of treaties with the Indian tribes in Oregon," and "for other purposes," it was enacted:

"That the law [June 30, 1834, *supra*] regulating trade and intercourse with the Indian tribes east of the Rocky mountains, or such provisions of the same as may be applicable, be extended over the Indian tribes in the territory of Oregon."

Under this section it was early held (*U. S.* v. *Tom, supra*) that so much of the act of 1834 as "tends to prevent immigration, the free occupation and use of the country by the whites, must be considered as repealed. Whatever militates against the true interests of a white population is inapplicable." But the provision (section 20) prohibiting the disposition of spirituous liquors to Indians was held applicable, as not being "necessary to the welfare" of the white people, but a blessing to the Indians and highly promotive of the safety, peace, and good order of the whole community."

This decision was followed in this district until section 20 of the act of June 30, 1834, was amended by the acts of February 13, 1862, and March 15, 1864, (12 St. 339; 13 St. 29,) so as to make the disposing of spirituous liquor to an Indian, *under the charge of an Indian agent,* a crime, without reference to the locality in which it was done. So, too, section 8 of the act, which prohibits any person from depasturing "the land belonging to any Indian or Indian tribe," has been considered in force in Oregon as to the land included within an Indian reservation, and enforced in this court. *U. S.* v. *Matlock*, 2 Sawy. 148.

What other features of the act of 1834 were or were not applicable to Oregon has not been decided, nor has it been specially considered what effect, if any, the making and ratification of the subsequent treaty under which this reservation exists and the admission of the state into the Union have upon this question.

In *U. S.* v. *Ward*, 1 Wool. 1, it was held by Mr. Justice

Miller that the act of 1834 conferred upon the national courts jurisdiction of offences against the laws of the United States committed on Indian reservations in Kansas, but that the act admitting the state into the Union had so far modified that act as to deprive the circuit court of jurisdiction in that particular case, which was an indictment for murder committed by one white man upon another, upon a reservation set apart by treaty for the Kansas tribe of Indians.

In *U. S.* v. *Yellow Sun*, 1 Dil. 271, it was held by Mr. Justice Dillon that the national courts in Kansas did not have jurisdiction of the crime of murder committed within the state of Kansas and not upon a reservation, by Indians belonging to a reservation therein, with an intimation that if the crime had been committed *on* the reservation the ruling would have been different.

In *U. S.* v. *Cisna*, 1 McLean, 256, it was held that the power of congress to regulate commerce with the Indian tribes does not cease on their being included within the limits of a state, but that the federal jurisdiction must cease, or is lost, where the Indians occupy a very limited territory, and are practically absorbed by the surrounding white population.

But in *U. S.* v. *Holliday*, 3 Wall. 407, it was held by the supreme court that the power of congress to regulate commerce with the Indian tribes is co-extensive with the subject, and applies to individuals constituting the tribes, although off a reservation and within the limits of a state, and therefore the act of 1864, *supra*, for the punishment of a person who disposes of spirituous liquor to an Indian under the charge of an agent, is constitutional, although the disposition took place within the limits of a state, to an Indian not upon, or belonging to, a reservation.

On June 9, 1855, a treaty was made with the Wallawalla, Cayuse, Umatilla, and other tribes and bands of Indians in Oregon and Washington territory, by which the reservation in question was set apart for the exclusive use of the Indians in consideration of their ceding their rights to a large extent

of country. The treaty (1? St. 945) provides that the reservation—

"Shall be set apart as a residence for said Indians; &ast; &ast; &ast; all of which tract shall be set apart, and, so far as necessary, surveyed and marked out, for their exclusive use; nor shall any white person be permitted to reside upon the same without permission of the agent and superintendent."

On February 14, 1859, (11 St. 383,) the state of Oregon, with exterior boundaries, including the Umatilla reservation, was "received into the Union on an equal footing with the other states in all respects whatever," without any proviso or provision concerning the Indians or Indian reservations therein.

On March 8, 1859, the treaty was ratified by the senate, and on April 11th it was proclaimed by the president.

The power to regulate commerce with Indian tribes includes not only traffic in commodities, but intercourse with such tribes—the personal conduct of the white and other races to and with such tribes and the members thereof, and *vice versa*. *Gibbons* v. *Ogden*, 9 Wheat. 189; *U. S.* v. *Holliday*, 3 Wall. 416. If the power to regulate the intercourse between the Indian and the white man includes the power to punish the latter for *giving* the former a drink of spirituous liquor within the limits of a state,—as it undoubtedly does,— (*U. S.* v. *Holliday*, supra, 415,) then it must follow that the power to regulate such intercourse extends to and includes the power to punish any other act of a white man having or taking effect upon the person or property of an Indian within such limits, and *vice versa*, even to the taking of life.

It is admitted that the power of congress to provide for the punishment of an act, as a crime, is limited to the subjects and places peculiar to the national government. Its power to do so arises from the locality of the act in question, when it is committed in a place within the exclusive jurisdiction of the United States, as its territories, forts, arsenals, etc.; and from the subject, when the punishment is imposed as a means of carrying into execution or enforcing any of the powers expressly granted to congress by the constitution—as

the power to lay and collect taxes, to borrow money, to regulate commerce, etc.

The act of 1834, as a regulation of trade and intercourse with the Indian tribes in the "Indian country," as defined in section 1 of that act, was within the power of congress, both on the ground of locality and subject—such "Indian country" being without the limits of any state, and therefore within the exclusive jurisdiction of the United States; and the intercourse with Indians being a subject within its jurisdiction generally. And as, when the act was extended over Oregon, on June 5, 1850, the latter was still a territory, the right to do so rested upon the same grounds—the power of congress over the locality and the subject.

But when Oregon was admitted into the Union—February 14, 1859—the power of congress over the Indian tribes in Oregon, or the intercourse between them and others, so far as it depended on the locality, was gone, unless, and so far as, it may have been saved by the operation of the treaty of June 9, 1855, establishing the Umatilla reservation. But the jurisdiction which was not dependent upon locality— the jurisdiction which arises out of the subject—the intercourse between the inhabitants of the state and the Indian tribes therein—remained as if no change had taken place in the relation of the territory to the general government. Congress could no longer prohibit the introduction, manufacture, or sale of spirituous liquor in the country, but only the disposition of it to Indians. And, as it could prohibit that as well within the limits of a state as a place where it had exclusive jurisdiction, it could punish the violation of such prohibition in the former case as well as the latter.

The necessary inference from these premises seems to be that the act of 1834, or so much of it as congress was authorized to enact within the limits of a state for the purpose of regulating the intercourse—the goings on—between the Indians and the inhabitants of the latter, remains in full force. Of this character are all the provisions of the act which punish persons for wrong or injury done to the person or property of an Indian, and *vice versa.*

This intercourse is a subject of federal jurisdiction, the same as the naturalization of aliens, the subject of bankruptcies, or the establishment of post-offices, and therefore congress may pass laws regulating or even forbidding it, and providing for the punishment of acts or conduct growing out of it or connected therewith, resulting in injury to either the Indian or the other party, or calculated to interrupt or destroy its peaceful or beneficial character.

Section 5356 of the Revised Statutes, which provides for the punishment of larceny committed in a place within the exclusive jurisdiction of the United States, was made a part of the act of 1834, by section 25 thereof, whenever the larceny was committed by a white man upon the goods of an Indian, and *vice versa;* and as such it was, in my judgment, extended over Oregon on June 5, 1850,—it not being locally inapplicable any more than the provision concerning the disposition of spirituous liquor to an Indian. Nor did the admission of the state into the Union upon "an equal footing" with the other states have the effect to modify or repeal this provision. If the same provision could not be made and enforced in every other state at the will of congress, then, of course, the admission of Oregon into the Union upon an equality with the other states would have worked a repeal of it. But congress has the power to legislate upon the subject of intercourse with Indian tribes, wherever they exist, irrespective of state lines or governments; and this provision against larceny by the parties to this intercourse, being well calculated to preserve the peace between them and prevent it from resulting in the shedding of innocent blood and cruel and devastating Indian wars, is as convenient and necessary to that end as any other that can be suggested. If congress can punish the defendant for *buying* Shick-Shuck's blanket—trading for it—why not for stealing it?

Upon the national government is devolved the power and duty to supervise and control the intercourse between the Indian and its citizens, so that, so far as possible, each may be protected from wrong and injury by the other, and in the exercise of this power, and the performance of this duty,

it is not limited or restrained by the fact that the Indians are within the limits of a state. The Indians were here before the state was, and the state was formed and admitted into the Union subject to their right to remain here, and the power of congress over the intercourse between them and the people of the state, until they are removed, or become a part of the latter, through the agency or with the consent of the United States. Nor is it material that the state has the general power to and does punish for larceny committed within its limits. So it has the power to regulate and control the disposition of spirituous liquor. But in neither case does this power exclude or supersede the paramount authority of the national government where the larceny or disposition touches upon, or affects a subject within its jurisdiction and power. As, for instance, the general police power of the state over the manufacture, sale, and use of distilled spirits within its limits is subordinate to the act of congress passed in pursuance of its power to regulate commerce, which permits the importation of such spirits into the state from foreign countries; nor can the state interfere with or tax the importer in the exercise of his right to sell and dispose of the same within its limits, in the original package. *Brown* v. *Maryland,* 12 Wheat. 419; *License Cases,* 5 How. 573.

The power to regulate commerce being construed to include navigation, (*Gibbons* v. *Ogden,* 9 Wheat. 186,) it has been held by the supreme court that congress may, in pursuance of this authority, provide for the punishment of persons who steal goods or effects belonging to a vessel in distress, or wrecked within the admiralty jurisdiction, although such goods are taken not immediately from the vessel, but above high-water mark on the land, and within the jurisdiction of the state. *U. S.* v. *Coombs,* 12 Pet. 72. Now, if congress, in pursuance of its power to regulate commerce, can punish for the larceny of goods constituting an element of that commerce anywhere within the state, why may not it, in pursuance of the same power, punish the defendant for the larceny of a blanket, within the state, from a member of an Indian

tribe, the intercourse with which is under its absolute control?

But there is another ground upon which the jurisdiction of the United States to punish this offence may be safely placed. The ratification of the treaty of June 9, 1855, on March 8, 1859, took effect by relation from the date of its signing, so that it was in full force when the state was admitted. *U. S.* v. *Reynes,* 9 How. 143; *Davis.*v. *The Police Court,* Id. 285; *Haver* v. *Yaker,* 9 Wall. 34. Like every other treaty made by the authority of the United States, this one was and is the supreme law of the land. Const. U. S. art. 6, subd. 2; *Worcester* v. *Georgia,* 6 Pet. 515. By it the Umatilla reservation was set apart for "the exclusive use" of the tribe of Indians to which Shick-Shuck belongs, and no white person was to be permitted "to reside upon the same" without the permission of the United States given by its superintendent and agent. In my judgment the effect of this treaty was to make the act of 1834 applicable thereto, except as otherwise provided therein, so that it became and is, to all intents and purposes, "Indian country," within the the meaning of that phrase as used in that act and the Revised Statutes.

The admission of the state into the Union, with this reservation established within its exterior lines, did not and could not have the effect to abrogate or modify this treaty, The act of admission is silent upon the subject, and admitting that the treaty might be repealed by an act of congress, (*Taylor* v. *Morton,* 2 Curt. C. C. 454; *The Clinton Bridge,* 1 Woolw. 155; *The Cherokee Tobacco,* 11 Wall. 620,) there is no reason to believe that congress intended by such act to affect it in any way. The necessity for the reservation was quite as apparent then as when it was created, and the treaty providing for it was ratified by the senate within a month after the passage of the act of admission. The reservation has ever since been maintained by the United States, and congress has continued to recognize its existence as provided in the treaty by making appropriations for its support.

In the *U. S.* v. *Leather,* and *Same* v. *Sturgeon,* (D. C. Nev. Dist. July, 1879,) in a well-considered opinion, Mr. Justice Hillyer held that an Indian reservation established in Nevada on March 3, 1874, by a mere executive order, for "the use" of certain Indians, and afterwards recognized as such by congress, was "Indian country," within the meaning of sections 2133, 2139, and 2148 of the Revised Statutes, providing for punishing persons who reside or trade in the Indian country without license, or return thither after being removed therefrom, or introduce spirituous liquor into such country or dispose of the same to an Indian therein.

Assuming, then, that the Umatilla reservation exists as established by the treaty, it is still "Indian country," set apart by law for the "exclusive use" of the Indians, and all crimes committed within it, by a white man upon an Indian, and *vice versa,* and made punishable by the laws of the United States, are within the jurisdiction of the federal courts for this district.

There is also much force in the suggestion made by Mr. Justice Hillyer in *U. S.* v. *Leathers, supra,* that as section 1 of the act of 1834, defining or describing the then limits or extent of the "Indian country," was repealed by title 74 of the Revised Statutes, (December 1, 1873,) there is now no Indian country to which the various provisions in title 28 of the Revised Statutes, relating to such country, and the conduct of persons thereon and thereabout, can apply, unless the several reservations set apart for their exclusive use in the various states are considered to be such.