## UNITED STATES *v.* MARTIN.

*District Court, D. Oregon.* February 3, 1883.)

1. **INDIAN COUNTRY—UMATILLA AGENCY.**

Since the repeal of section 1 of the Indian intercourse act of 1834 (4 St. 129) by section 5596 of the Revised Statutes, the only Indian country in the United States, within the purview of that phrase, as used in chapter 4, title 28, of the Revised Statutes, is the tracts of country set apart by the authority of the United States for the exclusive use and occupancy of particular Indian tribes, and known as Indian reservations; and the Umatilla reservation in Oregon is such Indian country.

2. **CRIMES COMMITTED BY OR AGAINST AN INDIAN.**

In the exercise of its constitutional power to regulate intercourse with the Indian tribes, congress may define and punish crimes committed by white men upon the person or property of an Indian, and *vice versa,* within as well as without the limits of a state.

3. **MURDER ON THE UMATILLA RESERVATION.**

Congress having provided for the punishment of murder committed in the Indian country, (sections 2145, 5339, Rev. St.,) the United States circuit court for the district of Oregon has jurisdiction of the crime of murder committed on the Umatilla reservation by an Indian upon a white man; and therefore it is a violation of section 5398 of the Revised Statutes for any one to resist or obstruct the execution of an order made by a circuit court commissioner, engaged in the examination of an Indian charged before him with the commission of murder, under such circumstances.

Information for Obstructing the Service of Process.

*James F. Watson,* for the United States.

*H. Y. Thompson,* for defendant.

DEADY, D. J. On January 9, 1883, an information was filed in this court by the district attorney, charging the defendant with a violation of section 5398 of the Revised Statutes, which enacts:

"Every person who knowingly and willfully obstructs, resists, or opposes any officer of the United States in serving or attempting to serve or execute any mesne process or warrant, or any rule or order of any court of the United States, or any other legal or judicial writ or process, or assaults, beats, or wounds any officer or other person duly authorized, in serving or executing any writ, rule, order, process, or warrant, shall be imprisoned not more than 12 months, and fined not more than $300."

The information contains two counts.

The first one alleges that on December 18, 1882, in this district, two Indians, namely, Peteus and Capsawalla, being then and there under the charge of an Indian agent, were duly arrested by the marshal of this district upon a warrant duly issued by a commissioner of the circuit court for this district, upon a charge of murder committed

by said Indians, in killing one —— Mulhenen, a white man, upon the Umatilla Indian reservation in this district, and were by the order of said commissioner duly committed to the jail of Umatilla county, for examination before him on said charge, the defendant being then and there the keeper of said jail; and that afterwards, on December 19th, said commissioner duly made and delivered to the deputy of said marshal an order commanding him to bring said Indians before him for examination upon the charge aforesaid, who then and there attempted to execute the same, but was prevented from so doing by the defendant, who knowingly and willfully refused to deliver said Indians to said deputy, and by force and violence prevented the latter from executing said order.

The second count alleges that the defendant obstructed an officer in the execution of process in the case of two other Indians, namely, Ah Hoot and Weet Snoot, charged before said commissioner on December 7, 1882, with the killing of said —— Mulhenen on said reservation, on which day they were duly committed by the order of said commissioner to the custody of P. McDowell, the keeper of the town jail at Pendleton, in said county, for examination on said charge; and that on December 18th the defendant took said Indians from the custody of said jailer of Pendleton, they being then and there in the custody of the latter under the order of the said commissioner.

Upon the filing of the information a warrant issued, upon which the defendant was arrested and held to bail in the sum of $1,000.

The defendant demurs to the information, and for cause alleges substantially that "the courts of the United States do not have jurisdiction to try the Indians named in the information for the crime with which they are charged," and therefore the order or process which the officer was attempting to execute was void and not within the purview of the statute.

The question made by this demurrer was considered and decided by this court in *U. S.* v. *Bridleman,* 7 Sawy. 243, [S. C. 7 FED. REP. 894]—an information charging a white man with stealing from an Indian on this same reservation.

In that case it was held that this court has jurisdiction of a crime committed on the Umatilla reservation by a white man upon the person or property of an Indian, and *vice versa,* provided the crime is defined by a law of the United States directly applicable to the Indian country, or made so by sections 2145, 2146, of the Revised Statutes, which enact:

"Section 2145. Except as to crimes, the punishment of which is expressly provided in this title, [28,] the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"Section 2146. The preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country, who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

The punishment of the crime of murder, committed in a place within the sole and exclusive jurisdiction of the United States, is provided for in section 5339 of the Revised Statutes, which enacts:

"Every person who commits murder within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States, * * * shall suffer death."

This section is made applicable to the Indian country by section 2145 of the Revised Statutes, *supra*; and if the Umatilla reservation is "Indian country," within the purview of the statute, the United States circuit court for this district has jurisdiction to try these Indians upon this charge of murder.

That the reservation is Indian country was held in *U. S.* v. *Bridleman, supra.* In that case the origin of this reservation, and the power of congress to regulate intercourse with the Indian tribes, was stated as follows:

"On June 9, 1855, a treaty was made with the Walla Walla, Cayuse, Umatilla, and other tribes and bands of Indians in Oregon and Washington territory, by which the reservation in question was set apart for the exclusive use of the Indians, in consideration of their ceding their right to a large extent of country. The treaty (12 St. 945) provides that the reservation 'shall be set apart as a residence for said Indians, which tract, for the purposes contemplated, shall be held and regarded as an Indian reservation; * * * all of which tract shall be set apart, and, so far as necessary, surveyed and marked out for their exclusive use; nor shall any white person be permitted to reside upon the same without permission of the agent and superintendent.'

"On February 14, 1859, (11 St. 383,) the state of Oregon, with exterior boundaries, including the Umatilla reservation, was 'received into the Union on an equal footing with the other states in all respects whatever,' without any proviso or provision concerning the Indians or Indian reservations therein.

"On March 8, 1859, the treaty was ratified by the senate, and on April 11th it was proclaimed by the president.

"The power to regulate commerce with the Indian tribes (U. S. Const. art. 1, § 8) includes not only traffic in commodities, but intercourse with such

tribes—the personal conduct of the white and other races to and with such tribes, and the numbers thereof, and *vice versa.* *Gibbons* v. *Ogden,* 9 Wheat. 189; *U. S.* v. *Holliday,* 3 Wall. 416.

"If the power to regulate the intercourse between the Indian and the white man includes the power to punish the latter for giving the former a drink of spirituous liquor within the limits of a state, as it undoubtedly does, (*U. S.* v. *Holliday, supra,*) then it must follow that the power to regulate such intercourse extends to and includes the power to punish any other act of a white man having or taking effect upon the person or property of an Indian within such limits, and *vice versa,* even to the taking of life.

"It is admitted that the power of congress to provide for the punishment of an act as a crime is limited to the subjects and places peculiar to the national government. Its power to do so arises from the locality of the act in question, when it is committed in a place within the exclusive jurisdiction of the United States, as its territories, forts, arsenals, etc.; and from the subject, when the punishment is imposed as a means of carrying into execution or enforcing any of the powers expressly granted to congress by the constitution; as the power to levy and collect taxes, to borrow money, to regulate commerce, etc.

"This intercourse is a subject of federal jurisdiction, the same as the naturalization of aliens, the subject of bankruptcies, or the establishment of post-offices, and therefore congress may pass laws regulating or even forbidding it, and providing for the punishment of acts or conduct growing out of it or connected therewith, resulting in injury either to the Indian or the other party, or calculated to interrupt or destroy its peaceful or beneficial character.

"Upon the national government is devolved the power and duty to supervise and control the intercourse between the Indians and its citizens, so that, as far as possible, each may be protected from wrong and injury by the other; and in the exercise of this power, and the performance of this duty, it is not limited or restrained by the fact that the Indians are within the limits of a state. The Indians were here before the state was, and the state was formed and admitted into the Union subject to their right to remain here, and the power of congress over the intercourse between them and the people of the state until they were removed or become a part of the latter through the agency or with the consent of the United States."

By this treaty, which was ratified after the admission of the state into the Union, and took effect by relation from the date of its signing, (*U. S.* v. *Reynes,* 9 How. 143; *Davis* v. *The Police Court,* Id. 285; *Haver* v. *Yaker,* 9 Wall. 34,) this Umatilla reservation was set apart for the "exclusive use" of the Indians named, and no white person was allowed "to reside upon the same" without the permission of the United States. And this treaty, like every other made by the authority of the United States, is the supreme law of the land. U. S. Const. art. 6, sub. 2; *Worcester* v. *Georgia,* 6 Pet. 515.

In *U. S.* v. *43 Gallons of Whisky,* 93 U. S. 188, Mr. Justice DAVIS, speaking for the supreme court, says: The power to regulate com-

merce with the Indian tribes is "as broad and free from restrictions as that to regulate commerce with foreign nations;" that "it is not confined to any locality," but "its existence necessarily implied the right to exercise it, whenever there was a subject to act upon, although within the limits of a state." Thus a treaty with a foreign nation may provide that the subjects of such nation may take real property situated in the United States by devise or descent, and although this may contravene the law of the state where the property is situated, such law must yield to the treaty, which the constitution makes supreme. Id. 197.

It may be conceded that the admission of Oregon into the Union upon an equality with the other states, without any special reservation of jurisdiction over the place then known and occupied as the Umatilla Indian reservation, extended the jurisdiction of the state thereover as to all subjects constitutionally within its power of legislation—such as a crime committed thereon by one white man upon another, and it may be by one Indian upon another. But the subject of the intercourse between the Indians and other people in Oregon still remained a matter within the jurisdiction of the United States, just as much as when the country was a territory.

In the case of the *U. S. v. Leathers,* 6 Sawy. 17, and the *U. S. v. Sturgeon,* Id. 29, it was held in the district court of Nevada that an Indian reservation established in Nevada on March 3, 1874,—after the admission of the state into the Union,—by a mere executive order, for "the use" of certain Indians, and afterwards incidentally recognized as such by congress, was "Indian country" within the meaning of sections 2133, 2139, and 2148 of the Revised Statutes, providing for the punishment of persons who reside or trade in the Indian country without license, or return thither after being removed therefrom, or introduce spirituous liquors into such country or dispose of the same to an Indian therein. On error from the circuit to the district court both these cases were affirmed by Judge SAWYER.

In this case, the government of the United States, in the exercise of its constitutional power to regulate trade and intercourse with the Walla Walla, Cayuse, Umatilla, and other tribes and bands of Indians in Oregon and Washington territory, through the action of the proper officers established this reservation while yet the state was a territory, and negotiated a treaty with these Indians, by the terms of which they were to reside thereon separate and apart from the whites, under the care and direction of the general government. The state was admitted into the Union without any provision on the sub-

ject *pro* or *con;* but immediately thereafter the treaty was ratified by the senate, and became the supreme law of the land. Nothing has since been done to modify it, or to limit its operation. The reservation has been exclusively occupied by the Indians, under the treaty, ever since they first went upon it, and congress has continually recognized it by annual appropriations, in pursuance of the treaty stipulations, for its support and the maintenance of an agent for the Indians thereon. The case is on all fours with the Nevada cases, except that this reservation was established by treaty instead of an executive order, and that the crime alleged to have been committed by these Indians is murder. But the difference in the mode of establishing the two reservations is not material, and if it were, this reservation has more claim to be considered "Indian territory" on that ground than the Nevada one. And the punishment of murder committed in the Indian country by the killing of a white man by an Indian, and *vice, versa,* is as plainly provided for in section 2145 of the Revised Statutes as either of the crimes charged in *U. S.* v. *Leathers* and *U. S.* v. *Sturgeon, supra.* Indeed, the only point in the case that is at all open to argument is the question whether the Umatilla reservation is Indian country or not.

It is admitted that there is no express definition in the Revised Statutes, as there ought to be, of what constitutes Indian country. Section 1 of the intercourse act of June 30, 1834, (4 St. 729,) defining the boundaries of the then Indian country, has been repealed by section 5596 of the Revised Statutes.

In the progress of legislation for and the occupation of the country included therein, it had before that time become practically obsolete. And now, unless the tracts of country included in the reservations established by the general government for the exclusive use and occupation of the several Indian tribes are "Indian country," there is none in the United States, and all the provisions in the Revised Statutes relating to it, and providing for the punishment of crimes committed therein, are nugatory and without effect for a want of a subject to operate on.

But so long as there is any reasonable ground to hold otherwise, this court cannot assume that congress was fatuous enough to enact chapter 4 of title 28 of the Revised Statutes, concerning the "government of the Indian country," when there was no Indian country to govern.

Ever since the phrase "the Indian country" found its way into the federal legislation, it has been used to signify not only a place or tract of country actually occupied by Indians, but also a tract so occu-

pied by them, and set apart or designated as exclusively for their use, under and by the authority of the United States.

In the progress of time what are known as "the Indian reserva-tions" have come to be the only country so occupied by them, and these now constitute the Indian country of the United States, and there is no other; and they are such in both law and fact. In *43 Gallons of Brandy*, 11 FED. REP. 47, Mr. Justice McCRARY held that section 1 of the intercourse act of 1834, *supra*, was repealed by sec-tion 5596 of the Revised Statutes, and that in his judgment the phrase "Indian country," as used in the Revised Statutes, now only includes "that portion of the public domain which is set apart as a reservation, or as reservations, for the use and occupancy of the Indians, and not the whole vast extent of the national domain to which the Indian title has not been extinguished." Upon a rehearing of this case (14 FED. REP. 539) the learned judge said: "An Indian reservation is a part of the public domain set apart by proper authority for the use and occupation of a tribe of Indians. It may be set apart by an act of congress, by treaty, or by executive order." See, also, upon this point, *U. S.* v. *Bridleman, U. S.* v. *Leathers,* and *U. S.* v. *Sturgeon, supra.*

All the authorities cited by counsel for defendant, namely, *U. S.* v. *Ward,* 1 Woolw. 17; *U. S.* v. *The Yellow Sun,* 1 Dill. 271; and *U. S.* v. *McBratney,* 104 U. S. 621, except the latter, were cited and examined in *U. S.* v. *Bridleman, supra,* and shown not to be in conflict with this conclusion.

In *McBratney's Case,* the defendant, a white man, was convicted, in the circuit court of the United States for the district of Colorado, of the murder of a white man upon the Ute Indian reservation, the same being within the state of Colorado. Upon a motion in arrest of judgment the opinions of the circuit justice and district judge were opposed upon the question of whether the circuit court had jurisdic-tion of the crime of murder committed under those circumstances; and the same was certified to the supreme court, who answered it by Mr. Justice GRAY in the negative.

But that case does not touch the question under consideration here. It is not claimed in this case that the United States has any other jurisdiction over this reservation than that which is incident to to its power to regulate the intercourse between the whites and In-dians thereon. Of course, this does not include the case of a crime committed there by one white man upon another, for that is a matter which does not concern or affect such intercourse; and therefore Mr. Justice GRAY, in the conclusion of his opinion, is careful to say that

the decision in that case does not affect any question 'as to the punishment of crimes committed *by or against Indians*.

The case of the *State* v. *Doxtater*, 47 Wis. 278, [S. C. 2 N. W. Rep. 436,] was also cited by counsel for defendant. In that it was decided that the state had jurisdiction of the crime of adultery committed on the Oneida reservation in Wisconsin by an Indian man with a white woman; but that does not touch the question of whether the United States has jurisdiction of the crime of murder committed on the Umatilla reservation by an Indian upon a white man.

The demurrer is overruled, and the defendant is ordered to appear for arraignment.

See *Forty-Three Cases of Brandy*, 14 FED. REP. 539, and note, 540; *Forty-Three Gallons of Brandy*, 11 FED. REP. 47, and note, 51.