UNITED STATES *v.* BARNHART and another.

*(Circuit Court, D. Oregon. December 8, 1884.)*

1. INDIAN COUNTRY—UMATILLA RESERVATION.

The Umatilla Indian reservation is a place within the geographical limits and general jurisdiction of the state of Oregon, but is also a tract of country to which the Indian title is not extinguished, and which has been permanently set apart by treaty as a reservation for the sole and exclusive use of the Indians thereon, and is therefore "Indian country," within the meaning of that phrase as used in the Revised Statutes.

2. INTERCOURSE WITH INDIAN TRIBES.

The United States has jurisdiction over the intercourse with tribal Indians, and congress may prohibit and provide for the punishment of acts relating to or affecting such intercourse anywhere in the United States.

3. JURISDICTION OF UNITED STATES COURTS OVER CRIMES COMMITTED ON THE RES-
    ERVATION.
       The United States courts of the district of Oregon have jurisdiction over all
    crimes committed on the Umatilla reservation by a white man on the property
    or person of an Indian, and *vice versa*, so far as the same have been defined by
    an act of congress.
4. PLEA OF AUTREFOIS ACQUIT.
       B. and A. were indicted in the United States court for the crime of man-
    slaughter, committed in killing Indian William on the Umatilla reservation, and
    pleaded to the indictment a former acquittal, from which plea it appeared ·
    they had been indicted and tried in the state court for the murder of said
    Indian, and acquitted, to which plea there was a demurrer. *Held*, that the
    crime of which the defendants were acquitted in the state court was not the
    same as that charged in the indictment in the United States court, and there-
    fore the plea was bad.

Indictment for Manslaughter.

*James F. Watson*, for the United States.

*W. Lair Hill*, for defendants.

DEADY, J.   On November 21, 1884, the grand jury of the United
States district court for this district, by an indictment then duly found,
accused the defendants of the crime of manslaughter, committed as
follows:   On May 13, 1884, the defendants,. being white men, did
"feloniously and willfully" shoot, with a revolving pistol, one William,
an Indian, then and there being on the Umatilla Indian reservation,
in this district, and belonging thereto, whereof he then and there died.
Afterwards the indictment was remitted to this court for trial.   On
November 24th the defendants demurred to the indictment, on the
ground that the court had no jurisdiction of the offense; and on No-
vember 26th they withdrew their demurrers, and on being arraigned
pleaded *autrefois acquit*, or a former acquittal of the same charge in
the circuit court of the state for the county of Umatilla.   From the
pleas it appears that on June 16, 1884, the defendants were jointly
indicted in said court for the crime of murder, committed in killing
the said William on May 13, 1884, in said county of Umatilla, which
includes said Indian reservation; and thereafter, to-wit, on July 2,
1884, were duly tried therein on said charge, on the plea thereto of
not guilty, and acquitted.   To these pleas the district attorney de-
murs, for that the facts stated therein "do not constitute a formal
acquittal of the offense set forth in the indictment, and do not con-
stitute a bar to the prosecution by the United States for said offense."

In *U. S.* v. *Bridleman*, 7 Sawy. 243, S. C. 7 FED. REP. 894, and in
*U. S.* v. *Martin*, 8 Sawy. 473, S. C. 14 FED. REP. 817, it was held that
the United States courts of this district have "jurisdiction of a crime
committed on. the Umatilla reservation by a white man upon the per-
son or property of an Indian, and *vice versa*, provided the crime is
defined by a law of the United States directly applicable to the In-
dian country, or made so by sections 2145 and 2146 of the Revised
Statutes.   The crime of manslaughter, when committed on the high
seas or in any place within the exclusive jurisdiction of the United
States, is defined by section 5341 of the Revised Statutes as the un-

lawful and willful injuring of another, without malice, but so as to cause death; and this section was extended to the Indian country, so as to include the case of the killing of an Indian by a white man, and *vice versa,* by sections 2145 and 2146 of the Revised Statutes. Under section 8, art. 1, of the constitution, the power of congress to provide for the punishment of a crime committed by a white man on the person or property of an Indian, and *vice versa,* anywhere in the United States, is undoubted. As was said in the case of *U. S.* v. *Bridleman, supra,* 249 :

"Upon the national government is devolved the power and duty to supervise and control the intercourse between the Indians and its citizens, so that, as far as possible, each may be protected from wrong and injury by the other, and in the exercise of this power and the performance of this duty it is not limited or restrained by the fact that the Indians are within the limits of a state."

But as congress has not seen proper to confer jurisdiction upon the national courts of the crime of murder or manslaughter growing out of intercourse between the whites and Indians, unless committed in the "Indian country," the only debatable point there ever was in these cases is whether the Umatilla reservation is "Indian country," within the meaning of that term as used in the Revised Statutes. In the *Bridleman* and *Martin Cases, supra,* the court held that the reservation was such Indian country; and it appears that the point has since been definitely decided in the same way by the supreme court in *Ex parte Crow Dog,* 109 U. S. 556; S. C. 3 Sup. Ct. Rep. 396. In that case, Mr. Justice MATTHEWS, speaking for the court, says the term "Indian country" "applies to all the country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, although much of it had been acquired since the passage of the act of 1834, and notwithstanding the formal definition in that act has been dropped from the statutes, excluding, however, any territory embraced within the exterior geographical limits of a state not excepted from its jurisdiction, by treaty or by statute, at the time of its admission into the Union, but saving, even in respect to territory not thus excepted, and [but?] *actually in the exclusive occupancy of Indians,* the authority of congress over it, under the constitutional power to regulate commerce with the Indian tribes, and under any treaty made in pursuance of it."

The Umatilla reservation was made by a treaty negotiated with the Indians now in the occupation of it, on June 9, 1855, and ratified by the senate on March 8, 1859,—22 days after the admission of the state into the Union. It was thereby set apart for the "exclusive use" of these Indians, and has been occupied by them, under the care and direction of congress, ever since. *U. S.* v. *Bridleman, supra,* 246. And although this reservation was never expressly excepted from the jurisdiction of the state, by either treaty or statute, it is nevertheless

territory to which the Indian title has never been extinguished, and "actually in the exclusive occupancy of Indians," in pursuance of a treaty of the United States. This brings it within the definition or description of "Indian country," in *Ex parte Crow Dog, supra.*

The question is not one of power in the national government, for, as has been shown, congress may provide for the punishment of this crime wherever committed in the United States. Its jurisdiction is co-extensive with the subject-matter,—the intercourse between the white man and the tribal Indian,—and is not limited by place or other circumstance. But congress has only made provision for the punishment of this crime, when committed in the Indian country, as defined or described by law. But, this reservation being such Indian country, the jurisdiction of this court over the offense is undoubted. Admitting this proposition, counsel for the defendants contends that in the killing of the Indian William there was but one crime, if any, committed, for which the defendants were subject to trial by either the state or the United States court, and that whichever of these jurisdictions first took cognizance of the case, took it with the absolute exclusion of the other, and therefore the defendants, having been first tried and acquitted on this charge in the state court, the question of their guilt or innocence is *res judicata*, and they cannot be retried upon it in this or any other court. This argument assumes that this homicide only involves one crime, 'of which neither the state nor national courts have exclusive jurisdiction, but only concurrent. Where an act constitutes a crime against two· sovereignties—as the state and the United States—there may be a "concurrent" right to proceed against the offender, so that whichever of the two governments first acquires jurisdiction of him shall be entitled to proceed *ad finem litis* without interference from the other. But, in the very nature of things, courts of different sovereignties cannot have concurrent jurisdiction of the same offense, unless it is one arising under some law common to them all; as the law of nations. Piracy, or robbing on the high seas, is a violation of this common or universal law, and therefore the courts of every nation in the civilized world have concurrent jurisdiction of it. And, this being so, a trial in one of them, upon such a charge, is considered a bar to a prosecution therefor in another. As was said in *U. S.* v. *Pirates*, 5 Wheat., 197:

"It [piracy] is against all, and punished by all; and there can be no doubt that the plea of *autrefois acquit* would be good in any civilized state, though resting on a prosecution instituted in the courts of any other civilized state."

But there was no crime involved in the killing of Indian William, punishable in any court, unless the law of Oregon or the United States made it so. No other power had any jurisdiction over the place where the killing occurred or the persons concerned in it. Nor could either of these make this killing a crime triable in the courts of the other. Neither is there any law common to both of them, as the law of nations, making this killing a crime, and under which either might

take jurisdiction of it to the exclusion of the other. The United States had declared the killing to be murder or manslaughter, according to the circumstances of the case, and provided for the punishment of the persons guilty of it in its own courts. The state also had a law providing for the punishment of persons guilty of such crimes, when committed within its geographical limits, not excluding this reservation. And while the latter comprehends the unlawful killing of any human being within the peace of the state, the former only extends to such killing of a human being known as a tribal Indian by a white man, and *vice versa.* But the crimes defined by these laws, however similar in circumstance or origin, are legally distinct. They are offenses against different sovereignties and triable in different courts.

In *U. S.* v. *Martin, supra,* 478, it is "conceded that the admission of Oregon into the Union upon an equality with the other states, without any special reservation of jurisdiction over the place then known and occupied as the Umatilla Indian reservation, extended the jurisdiction of the state thereover as to all subjects constitutionally within its power of legislation, such as a crime committed thereon by one white man upon another, and it may be by one Indian upon another." But as this subject of the intercourse between the white man and the Indian is committed by the constitution to the government of the United States, and as congress has provided for the punishment of a white man for the felonious killing of an Indian upon this reservation, and *vice versa,* it is not admitted that the state has any authority over such killing, or power to punish or absolve the person committing the same. Local interference in such cases generally results in the punishment of the Indian and the acquittal of the white man.

Most of the Indian wars which have desolated the frontier of this country, in the last 30 years, have been the direct result of crimes committed by a few lawless and savage white men upon Indians, which the local authorities were powerless or indisposed to punish. As a rule, the proceedings in these tribunals have resulted in one judgment for the white man and another for the red one. No white man was ever hung for killing an Indian, and no Indian tried for killing a white man ever escaped the gallows. But it may be that the state can punish acts growing out of the intercourse between the whites and Indians, until congress vests the jurisdiction thereof exclusively in the national courts. See *Coleman* v. *Tennessee,* 97 U. S. 514. But be this as it may, and assuming for the present that the state has authority to provide for the trial and punishment or acquittal of a white person charged with the commission of a wrong upon the person or property of an Indian, on this reservation, still the pleas of a former acquittal are not good. The crime set forth in these pleas, of which it thereby appears the defendants were acquitted in the state court, is not the same crime charged in this indictment. The former is a

crime committed by the doing of an act which violated a law of the state of Oregon, while the latter is a crime arising out of a violation of a law of the United States.

A person living under two governments or jurisdictions, as does every inhabitant of the states of this Union, may commit two crimes by doing or omitting one act—one against the state and the other against the United States. And in such case the conviction or acquittal of the one crime, in a forum of the state, is no bar to a prosecution for the other, in a forum of the United States. The maxim, *nemo debet bis puniri pro uno delicto*, now improved and incorporated into the constitution of the United States (fifth amendment) in the words, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb," does not apply, for the offenses are not the same. This inhibition is a limitation upon the power of the government of the United States, and not that of the state, (*Barron* v. *Mayor, etc.*, 7 Pet. 247; *Twitchell* v. *Com.* 7 Wall. 325,) and its only effect is to restrain the former from putting any person in jeopardy twice for the same offense; that is, an offense defined by its laws and triable in its courts. It matters not how often a person has been put in jeopardy elsewhere or otherwise on account of the act or conduct constituting such crime; it is no defense to a prosecution, therefore, in the courts of the United States.

In *Fox* v. *Ohio*, 5 How. 432, the supreme court held that the state of Ohio could punish a person for passing a counterfeit coin, though made in the similitude of a dollar of the coinage of the United States. In *U. S.* v. *Marigold*, 9 How. 565, the same court held that the United States had authority to punish the same act, as incident to its power to coin money and regulate the value thereof. In this case Mr. Justice DANIEL, speaking for the court, (page 569,) said:

"This court, in the case of *Fox* v. *Ohio*, have taken care to point out that the same act might, as to its character and tendencies, and the consequences it involved, constitute an offense against both the state and the federal governments, and might draw to its commission the penalties denounced by either as appropriate to its character in reference to each."

In *Moore* v. *People*, 14 How. 17, it was held that the act of Illinois making it an offense to harbor or secrete a fugitive from labor was not in conflict with the constitution or any law of the United States, and that an act may be an offense both against the law of the state and another of the United States. Mr. Justice GRIER, in delivering the opinion of the court, (page 20,) said:

"Every citizen of the United States is also a citizen of a state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the law of either. The same act may be an offense or transgression of the laws of both. Thus, an assault upon the marshal of the United States, and hindering him in the execution of legal process, is a high offense against the United States, for which the perpetrator is liable to punishment; and the same act may also be a gross breach of the peace of the state, a riot, assault, or a murder, and subject the same person to a pun-

ishment, under the state laws, for a misdemeanor or felony. That either or both may, if they see fit, punish such an offender, cannot be doubted. Yet it cannot be truly avowed that the offender has been twice punished for the same offense, but only that by one act he has committed two offenses, for each of which he is justly punishable. He could not plead the punishment of one in bar to a conviction of the other."

In *U. S.* v. *Cruikshank,* 92 U. S. 542, Mr. Chief Justice WAITE, in discussing the subject of citizenship of the state and the United States, disposes of this question in the following clear statement, that amounts, I think, to demonstration:

"The people of the United States resident within any state are subject to two governments: one state and the other national; but there need be no conflict between the two. The power which the one possesses the other does not. They are established for different purposes, and have separate jurisdictions. Together they make one whole, and furnish the people of the United States with a complete government, ample for the protection of all their rights at home and abroad. True, it may sometimes happen that a person is amenable to both jurisdictions for one and the same act. Thus, if a marshal of the United States is unlawfully resisted while executing the process of the courts within a state, and the resistance is accompanied by an assault upon the officer, the sovereignty of the United States is violated by the resistance, and that of the state by the breach of the peace in the assault. So, too, if one passes counterfeited coin of the United States within a state, it may be an offense against the United States and the state: the United States, because it discredits the coin; and the state, because of the fraud upon him to whom it is passed. This does not, however, necessarily imply that the two governments possess powers in common, or bring them into conflict with each other. It is the natural consequence of a citizenship which owes allegiance to two sovereigns and claims protection from both. The citizen cannot complain, because he has voluntarily submitted himself to such form of government. He owes allegiance to the two departments, so to speak, and, within their respective spheres, must pay the penalties which each exacts for disobedience to its laws. In return, he can demand protection from each within its own jurisdiction."

Upon these authorities and on principle it is clear that the pleas are bad. The defendants have never been tried for the offense charged in this indictment. For either, the state court before which they were tried had no jurisdiction in the premises, and then the proceeding set forth in the pleas was a nullity; or if it had, it was of an offense against the law of the state and not the United States. But, after all, the most serious argument in support of this defense has been the hardship of being compelled to submit to two trials for one act. But that is no defense to the indictment, however much, in a proper case, it might operate to prevent the finding or prosecution of a second one therefor. As was said by Mr. Justice DANIEL in *Fox* v. *Ohio, supra,* 435, in reply to the same suggestion:

"It is almost certain that in the benignant spirit in which the institutions both of the state and federal systems are administered, an offender, who should have suffered the penalties denounced by the one, would not be subjected a second time to punishment by the other, for acts essentially the same, unless, indeed, this might occur in instances of peculiar enormity, or when the public safety demanded extraordinary rigor."

And again, it must be born in mind that the policy of the state and the United States may be, and sometimes is, at variance on a given subject. In such case, the former may indirectly hinder or defeat the policy of the latter, if a trial in its courts for a crime growing out of an act which also constitutes a crime against the United States can be used as a bar to a prosecution of the offender in the national courts. For instance, the United States, under the fifteenth amendment, may punish any one who discriminates against the exercise of the elective franchise by another on account of color. *U. S. v. Reese*, 92 U. S. 217. But if the state may also declare such an act a crime, it may purposely affix a mere nominal punishment thereto, and thus give any one guilty of such an act an opportunity to seek refuge in its tribunals before the United States can reach him, and by a trial and acquittal therein, at the hands of a sympathizing jury, or the imposition of a mere nominal punishment, effectually prevent the United States from prosecuting the offender in its own courts, and inflicting such punishment upon him as may be necessary to vindicate its authority and maintain its policy in the premises.

Indeed, if a trial and acquittal or punishment in a state court, under such circumstances, is a bar to a prosecution in this court for the crime of which these defendants stand indicted herein, it is difficult to see why a pardon by the governor of the state would not have the same effect. In short, it is impossible that the United States can maintain its paramount authority over the subjects committed by the constitution to its jurisdiction, and at the same time allow a trial in a state court on a criminal charge growing out of an act that congress has defined to be a crime, to be a bar to a prosecution therefor in its own courts and according to its own laws.

The demurrers to the pleas are sustained, and the defendants are put to plead to the indictment, guilty or not guilty.