## JEMIMA GOODSON V. UNITED STATES.

(Filed July 30, 1898.)

1. COURTS—*Jurisdiction—Indian Reservation—Exceptions.* The district courts of the Territory of Oklahoma, when sitting with, and exercising the powers and jurisdiction of, a United States court, have exclusive jurisdiction of all crimes punishable by the laws of the United States, when committed by persons other than Indians upon an Indian reservation occupied by Indian tribes, and to which reservation the Indian title has not been extinguished; also, of all such crimes when committed by an Indian on such reservation, except the specific crimes of murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny.

2. JURISDICTION—*United States Courts—Indian Country.* It is not required that the United States shall exercise sole and exclusive jurisdiction over an Indian reservation and its inhabitants, in order that the United States courts may have jurisdiction to try offenses made punishable by the laws of the United States when committed upon such reservations. Section 2145, R. S. U. S., makes all offenses which would be punishable if committed in a place over which the United States exercised sole and exclusive jurisdiction likewise punishable when committed in the Indian country. And the United States courts have jurisdiction of all such offenses when committed by any person other than an Indian, and also of all such offenses when committed by an Indian on an Indian reservation, except the specific crimes of murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny.

3. ORGANIC ACT—*Legislative Power—Limitation.* The provisions of the Organic Act of Oklahoma are not inconsistent with the provisions of section 2145, and do not repeal said section, and the power given the Territorial legislature to legislate on all rightful subjects not inconsistent with the constitution and laws of the United States limits such power to making only those acts criminal when committed upon an Indian reservation which are not already made punishable by a law of the United States.

4. TERRITORIES—*Sovereign Powers.* The sovereign power resting in the inhabitants of a territory is exercised only through the congress of the United States and such subordinate governmental agencies as congress may create or authorize. There is no sovereignty in a territorial government, and all the powers that it exercises are powers of the United States, delegated to it, and are always subordinate and subservient to the United States and the constitution and laws of the United States. Congress has conferred no power upon the legislature of the Territory, authorizing it to enact laws to take the place of those adopted by congress; and the territorial

laws defining crimes, and prescribing punishments therefor, have no application to Indian reservations, where congress has by special enactment created the same offenses, and made them punishable under the laws of the United States.

5. STATUTE—*Construction of.* It is a settled rule of construction that an express statute conferring special powers and rights is held never to be repealed by implication, unless the intent to effect such repeal is clearly expressed.

6. CRIMINAL LAW—*Adultery.* Adultery is a crime, under the laws of the United States, when committed on an Indian reservation, and the United States court exercising jurisdiction over such reservation has jurisdiction to try and determine such case.

7. PROCEDURE CRIMINAL—*Practice—Common Law.* In any criminal proceeding, when it is found that the provisions of the criminal procedure act are inapplicable or ineffectual to meet the necessary requirements, the district courts, being courts of general common-law powers, may resort to the practice as it existed at common law to supply the statutory defects; but, when the common-law method of summoning and impaneling jurors is resorted to, the jurors so selected must have the qualifications prescribed in the statutes of the Territory, or, in the absence of any statutory provisions, must have the common-law qualifications of freeholders of the vicinage.

8. JURORS—*Qualifications—Indian Reservations.* The court takes judicial notice of the conditions of title in the Osage and Kansas Indian reservations, and that there are no resident freeholders within said reservations qualified to serve as jurors.

9. PAWHUSKA COURT—*Act Relating to Construed.* The provisions of the Organic Act, the order of the supreme court attaching the Osage and Kansas Indian reservations to Pawnee county for judicial purposes, and the act of June 7, 1897, requiring a district court to be held at Pawhuska, should all be construed together, and the later act held as modifying and supplementing the former, and not repealing the jurisdiction of the Pawnee district court, except as to causes in which members of the Osage or Kansas tribes are sued or prosecuted.

10. SAME—*Purpose of Jurisdiction.* The intention of congress, as evidenced by the act requiring a district court to be held at Pawhuska, was not to disturb the general jurisdiction of the district court of Pawnee county over persons, crimes, and property in said reservation, except in so far as the same related to actions, civil or criminal, against the resident members of the Osage and Kansas Indian tribes. The purpose was to provide a court where such members could be allowed to defend against any proceedings brought against them without going to a distant place, or among strange people, to

defend their rights or interests. We hold that the Pawhuska district court has jurisdiction only of those actions, civil or criminal, in which a res.dent member of the Osage or Kan as tribes of Ind ans is a defendant; that the district court of Pawnee county, when sitting as a United States court, has jurisdiction of all offenses committed by persons other than Indians upon said reservat·ons, made punishable by the laws of the United States; that the Pawnee district court, when sitting as a territorial court, has jurisdiction of all offenses committed upon said reservations by persons other than Indians, wh.ch offenses are punishable under the laws of the Territory, and are not punishable under a law of the United States, and of all civil actions ar·sing within said reservat·ons in which a resident member of the Osage or Kansas tribes is not a party defendant.

11. SAME—*Executive and Prosecuting Officers.* The sheriff and county attorney of Pawnee county are the proper executive and prosecuting officers for the Pawhuska court, and should attend its sittings, and perform the duties required of them by law.

12. SAME—*Jurors—Qualification.* The persons whose names are selected in the manner prescribed by statute for jurors in Pawnee county are competent and qualified jurors for the Pawhuska distr.ct court, and should be ordered, drawn, and summoned in the same manner as jurors for the Pawnee district court; and they may be compelled to attend said court at Pawhuska, and perform jury service in said court.

13. SAME—*Jurisdiction—Limitation.* The Pawhuska district court can exercise no jurisdiction as a United States court, except for the punishment of crimes committed by Indians on the Osage or Kansas Indian reservations, and not mentioned in the act of congress (23 Stat. 385) viz. murder, manslaughter, rape, assault with intent to kill, arson, burg.ary, and larceny, which said enumerated offenses must be prosecuted on the territorial side of said court.

14. CRIMINAL LAW—*Legislative Power to Make—Acts Distinguished.* The legislature may make any act criminal when committed on an Indian reservation which act is not punishable as a cr.me un 'er the laws of the United States, and the territorial courts will have jurisdiction of such offenses. But, in so far as the territorial laws attempt to punish the same acts made criminal by the laws of congress when committed within an Indian reservation, such laws are inconsistent w.th the laws of the United States, and within the inhib.ted powers of the legislature.

(Syllabus by the Court.)

*Error from the District Court of Pawhuska; before A. G. C. Bierer, District Judge.*

*Eagleton & Morphis* and *Morgan & Pancoast,* for plaintiff in error.

*Caleb R. Brooks* and *S. L. Overstreet, United States Attorney,* for defendant in error.

Jemima Goodson was convicted of an offense, and she appeals.    Reversed.

Opinion of the court by

BURFORD, C. J.: The plaintiff in error, Jemima Goodson, was indicted, arraigned, tried, convicted, and sentenced for the crime of adultery, committed within the Osage Indian reservation, at the November, 1897, term of the district court held at Pawhuska, in and for the Osage and Kansas Indian reservations, and sitting with, and exercising the powers and jurisdiction of, a circuit and district court of the United States.    Prior to the commencement of said term the presiding judge of that court issued an order to the clerk of the district court authorizing him to issue open venires for sixteen qualified persons to serve as grand jurors, and for twenty-four persons to serve as petit jurors, at said term of court.    The venires were issued and delivered to the United States marshal for Oklahoma, and directed him to summon qualified jurors from the body of the Osage and Kansas Indian reservations.    The marshal served the venires by summoning sixteen residents of the reservation for grand jurors, and twenty-four residents for petit jurors.    On the first day of the term these persons were in attendance, and from the persons summoned as grand jurors, a grand jury was impaneled by the court. The plaintiff in error, before the grand jurors were sworn, interposed a challenge to the panel on the grounds that

they had not been selected, drawn, and summoned according to law, and that they were not qualified jurors under the statutes of Oklahoma. The court overruled the challenge, and the defendant excepted. This grand jury returned the indictment on which the defendant was tried and convicted. On arraignment she made a motion to set aside the indictment on the ground that the grand jury had not been properly selected, drawn, and summoned, and that they were not qualified jurors. The motion was overruled, and she then demurred to the indictment on the ground that it did not charge a public offense, and for the reason that the court was without jurisdiction of the crime charged. The demurrer was overruled, and exception saved. A trial jury was then selected from the number summoned by the marshal, and before they were sworn the defendant interposed a challenge to the array on the ground that they were not qualified jurors, and also that said jurors had not been drawn and selected as provided by law. This challenge was overruled, and exceptions saved. After verdict and before judgment she moved for a new trial, and again renewed her former objections, together with others, to certain rulings occuring on the trial. The motion was overruled, and proper exceptions saved. She was then sentenced to serve a term of three years in the United States penitentiary at Leavenworth, Kan. From this judgment she prosecutes this appeal.

The first question presented for our consideration is whether or not the district court, sitting as a United States court, has jurisdiction over the crime of adultery committed within the Osage Indian reservation. The defendant was indicted by a grand jury impaneled and

acting as a United States grand jury, and was tried and sentenced by the court sitting as a United States court, and punished for an offense under the laws of the United States. It is contended on one hand that the United States courts have jurisdiction of all offenses made punishable by the laws of the United States when committed by a white person upon an Indian reservation, while on the other hand it is contended that when congress created the Territory of Oklahoma, and authorized the legislature of the Territory to legislate upon all rightful subjects not inconsistent with the constitution and laws of the United States, the United States surrendered its jurisdiction over all crimes not pertaining strictly to federal matters, and delegated to the Territory the right to define crimes, and punish violations of its laws committed at any place within the borders of the Territory, whether on an Indian reservation or not, and that the defendant should have been tried in the Territorial court, under the laws of Oklahoma.

As before stated, the Osage and Kansas (commonly called Kaw) Indian reservations are embraced within the borders of Oklahoma, and the Indian title to the lands within the reservations has never been extinguished. These reservations are set apart exclusively for the use of the Indians, and are not subject to settlement or occupancy of white persons. The Indians still sustain their tribal relations, and are under the charge and control of an Indian agent, and are the subjects of government bounty at every recurring session of congress. It has been repeatedly and uniformly held that an Indian reservation, as meant by the several acts of congress relating to such territory, is Indian country. (*Bates v.*

*Clark,* 95 U. S. 204; *U. S. v. Bridleman,* 7 Fed. 894; *U. S. v. Martin,* 14 Fed. 817; *U. S. v. Leathers,* 6 Sawy. 17, Fed. Cas. No. 15,581; *Forty-Three Gallons of Cognac Brandy,* 11 Fed. 47; *In re Wilson,* 140 U. S. 575, 11 Sup. Ct. 870; *U. S. v. McBratney,* 104 U. S. 621.)

Section 2145, R. S. U. S., provides: "Except as to crimes, the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." By this section the general laws of the United States defining and prescribing punishment for crimes, except as to certain offenses which were already made punishable in the Indian country, were extended to, and made applicable to, all Indian reservations then or thereafter set apart for the exclusive use and occupancy of the Indians, and in which the Indians have any equitable or legal title. It is contended that, in order to give the United States court jurisdiction over crimes in any place, the United States must have exclusive jurisdiction. But this claim is not well founded, and section 2145 is not susceptible of any such interpretation, but it means that the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States shall apply to all crimes committed in the Indian country. In other words, if an act is punishable under the laws of the United States when committed on an arm of the sea, or in a fort or arsenal of the United States, then the same act is punishable by the same law when committed on an Indian reservation, whether the

United States has sole and exclusive jurisdiction with such reservation, or only concurrent jurisdiction with some other or subordinate sovereignty. The words "sole and exclusive" do not apply to the jurisdiction extended over the Indian country, but are only used to designate the laws which are extended to it. (*In re Wilson*, 140 U. S. 575, 11 Sup. Ct. 870.)

Until very recently the United States never attempted to exercise sole and exclusive jurisdiction over any of the Indian country occupied by any Indian tribe or Indian nation, but the United States has uniformly, by treaty, agreement, and congressional enactment, not only recognized the rights of the Indians to carry on local tribal governments, but has specifically authorized the punishments of crimes by the tribal courts and authorities. Yet it has never been held in any case, or even seriously contended, that congress was not authorized to make laws for the punishment of crimes committed on these reservations, and to give the United States courts jurisdiction in all such cases. We have made a diligent search through the decisions of the courts of the several territories and the courts of the United States to find some case holding that the United States had no jurisdiction to try offenses committed on Indian reservations in the territories, and our search has been in vain. The reports of the appellate courts of every territory in the past contain causes clearly showing that it has always been the practice in the territories for such cases to be tried in the United States courts. It has been the settled practice of the courts and settled policy of the United States since the establishment of the territorial government. This practice has also received the sanc-

tion as well as the express approval of the supreme court of the United States. The rule as to jurisdiction of the United States courts to punish crimes committed on an Indian reservation in a state was different prior to the act of 1885, (23 Statutes 385,) conferring such jurisdiction on the circuit court of the United States. It was almost uniformly held by the courts that the admission of a state into the Union "upon an equal footing with the original states in all respects whatever" conferred upon the state the exclusive jurisdiction to punish for local crimes not relating to governmental functions of the United States; and this was on the theory that the state could not be supreme and sovereign as a state if it could not control its own domestic affairs, and exercise complete control over its citizens. A number of cases in the circuit and supreme courts of the United States announce this doctrine. (*U. S. v. McBratney*, 104 U. S. 621.)

But in 1885 congress passed an act changing this rule and which is now the law. Section 9, ch. 341, 23 Statutes, 385, provides "that immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person, any of the following crimes, namely: murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any territory of the United States, and either within or without an Indian reservation, shall be' subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all

such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons, committing any of the above crimes within the exclusive jurisdiction of the United States." This law changed the practice as to the prosecution of crimes committed on Indian reservations, both in the territories and in the states. Prior to this act, as we have before stated, it was the universal pratice to prosecute offenses committed on an Indian reservation within the borders of a state in the state courts, and to prosecute all crimes committed on a reservation in a territory in the United States courts. This act gives the United States courts jurisdiction to punish the offenses of murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny, when committed by an Indian on an Indian reservation in a state, and confers upon the territorial courts the jurisdiction to punish Indians committing either of such crimes on an Indian reservation in a territory. But it makes no change in the law as to crimes committed by persons other than Indians on Indian reservations. The law as it was prior to this act remains in force, unless there has been some change since that date. The Organic Act of this Territory confers upon the district courts all the powers and jurisdiction of the circuit and district courts of the United States in cases arising under the laws and constitution of the United States. Section 6 provides "that the legislative power of the Territory shall

extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States." Under this grant of authority the legislature of Oklahoma has passed a general crimes act, defining crimes and prescribing the punishment for each, and among others the crime of adultry. It has also adopted a general code of criminal procedure to govern in the arrest and trial of persons charged with the commission of crime.

It is claimed that congress surrendered its jurisdiction over the Indian reservations, and has delegated to the Territory the power to fix the crimes and prescribe their punishment, and to the courts of Oklahoma, as territorial courts, exclusive jurisdiction of all such offenses, whether committed on or off an Indian reservation. If this is a correct interpretation of the Organic Act, then it results in an entire change of the past policy and practice of the government, as well as of the other territories.

In the case of *U. S. v. McBratney*, 104 U. S. 621, the courts had under consideration the question as to whether the circuit court of the United States for the district of Colorado, prior to the passage of the act of 1885, had jurisdiction of an indictment for the murder of a white man by a white man within the Ute reservation in said state. The act creating the territory of Colorado, (Act Feb. 28, 1861, ch. 59, sec. 16,) contained this provision: "The constitution and all laws of the United States which are not locally inapplicable, shall have the same force and effect within the said territory of Colorado as elsewhere in the United States." And Mr. Justice Gray said: "If this provision of the first section had remained in force after Colorado became a state, this indictment might

doubtless have been maintained in the circuit court of the United States." This same provision is contained in our Organic Act, and certainly has the same force and effect as that same provision in the act creating the territory of Colorado. The act creating Colorado as one of the states of the Union, (18 Statute 474,) contained the same provision as above quoted, and as to its effect upon the powers of the state the same learned justice said: "Such a provision has a less extensive effect within the limits of one of the states of the Union than in one of the territories of which the United States have sole and exclusive jurisdiction." And the court in this case followed the rule so often laid down by the circuit courts, that the courts of the United States had no jurisdiction to punish offenses committed on an Indian reservation within a state.

In the *Case of Gon-shay-ee*, 130 U. S. 343, 9 Sup. Ct. 542, the petitioner, an Apache Indian, was convicted of the crime of murder, and sentenced to death, under a judgment of the district court of the United States for Arizona. He assailed the jurisdiction of the court by *habeas corpus*. Mr. Justice Miller, speaking for the court, said: "It may be conceded that prior to the statute of 1885 so far as Indians could be punished for offenses of this kind in any court, either federal or territorial, the jurisdiction would belong to the one sitting as a United States court, and exercising the judicial functions appropriate thereto." The court there held that, owing to the provisions of the act of 1885, Indians were triable for murder in the territorial courts, whether the offense was committed on or off a reservation.

In the case of *U. S. v. Monte*, 3 Pac. 45, the supreme court of Utah held that the United States court had juris-

diction of a crime committed by a white person on an Indian reservation, and this practice prevailed in that territory until it became a state. The same practice has always prevailed in the territories of New Mexico and Arizona, as we gather the same from their decided cases. The only time this question appears to have been squarely before the supreme court of the United States was in the case of *In re Wilson*, 140 U. S. 575, 11 Sup. Ct. 870. Wilson was convicted for the crime of murder committed on an Indian reservation in the territory of Arizona. He was tried and sentenced in the United States court for the second district of the territory. He was a negro, and the man he killed was a negro. He claimed that the United States had no jurisdiction, and that the judgment rendered against him was void, for the reason that he should have been tried under the laws of the territory, and in the court sitting for the territory, and exercising territorial jurisdiction. The Organic Act of the territory of Arizona is found in 12 Statutes, 664, and it contains no provisions excluding any Indian country or reservations from the operation of the territorial jurisdiction; nor are there any limitations on the powers of territorial government in reference to such reservations of country. At the time Arizona territory was organized the White Mountain Indian reservation did not exist. The territory comprising this Indian reservation was set apart and constituted as a reservation by order of the president in 1871. This executive order was, however, recognized and legalized by act of congress in 1887. (24 Statute, 388.) The judgment was rendered against Wilson in 1890. The principal questions presented to the supreme court were whether this Indian reservation was Indian country, and

—9

whether he was answerable to the laws of the territory or of the United States for the crime of murder. Mr. Justice Brewer delivered the opinion, and the entire bench concurred. That portion of the opinion which relates to the question under consideration in this case is as follows:

"The necessary effect of this legislative recognition was to confirm the executive order, and establish beyond challenge the Indian title to this reservation. Indeed, the fact that this is an Indian reservation is not contested by the petitioner, but rather assumed by him in his argument. His proposition is that congress, by act approved March 3, 1885, (23 Statute 385, ch. 341, sec. 9,) conferred upon the territory and her courts full jurisdiction of the offense of murder when committed on an Indian reservation by an Indian. (*Ex parte Gon-shay-ee*, 130 U. S. 343, 9 Sup. Ct. 542.) This offense had heretofore, when committed in such place by others than an Indian, been cognizable by the courts of the United States, under Revised Statute, sec. 2145. The petitioner believes that the United States, by yielding up a part of her jurisdiction over the offense of murder when committed on an Indian reservation, lost all—that is, that her jurisdiction of the offense in the paticular place must be 'sole and exclusive,' or will not exist at all; that it cannot be that there shall be one law and one mode of trial for a murder in a particular place if committed by an Indian, and another law and mode of trial for the identical offense in the same place committed by a white man or a negro. We are unable to yield our assent to this argument. The question is one of statutory construction. The jurisdiction of the United States over these reservations, and the power of congress to provide for the punishment of all offenses committed therein, by whomsoever committed, are not open questions. ( *U. S. v. Kagama*, 118 U. S. 375, 6 Sup. Ct. 1109.) And, this power being a general one, congress may pro-

vide for the punishment of one class of offenses in one
court, and another class in a different court. There is no
necessity for, and no constitutional provision compelling,
full and exclusive jurisdiction in one tribunal; and the
policy of congress for a long time has been to give only
a limited jurisdiction to the United States courts. Sec-
tion 2145 extends to the Indian country the general laws
of the United States as to the punishment of crimes com-
mitted in any place within the sole and exclusive juris-
diction of the United States, except as to crimes the pun-
ishment of which is otherwise expressly provided for. This
Indian reservation is a part of the Indian country, within
the meaning of that section. (*Bates v. Clark*, 95 U. S. 204;
*Ex parte Crow Dog*, 109 U. S. 556, 3 Sup. Ct. 396.) But this
extension of the criminal laws of the United States over
the Indian country is limited by the section immediately
succeeding, (214,) as follows: 'The preceeding section shall
not be construed to extend to crimes committed by one
Indian against the person or property of another Indian,
nor to any Indian committing any offense in the Indian
country who has been punished by the local law of the
tribe, or to any case where, by treaty stipulations, the
exclusive jurisdiction over such offenses is or may be se-
cured to the Indian tribes respectively.' So that before
the act of 1885 the jurisdiction of the United States courts
was not sole and exclusive over all offenses committed
within the limits of an Indian reservation. The words
'sole and exclusive,' in section 2145, do not apply to the
jurisdiction extended over the Indian country, but are
only used in the description of the laws which are ex-
tended to it. The effect of the act of 1885 was not to trans-
fer to territorial courts a part of the sole and exclusive
jurisdiction of United States courts, but only a part of the
limited jurisdiction then exercised by such courts, togeth-
er with jurisdiction over offenses not theretofore vested
therein. The argument of the petitioner therefore fails.
There has been no transfer of part of a sole and exclusive
jurisdiction, carrying by implication, even in the absence

of express language, a transfer of all jurisdiction, but only a transfer of part of an already limited jurisdiction, and neither by language nor implication transfering that theretofore vested, and not in terms transferred. We may here, in passing, notice that the distinction between district courts when sitting as courts of the territory and when sitting as courts of the United States was fully developed and explained in the case *Ex parte Gon-shay-ee, supra*; that by section 629 of the Revised statutes the circuit courts of the United States are given jurisdiction of crimes and offenses cognizable under the authority of the United States; and that by the act organizing the territory of New Mexico, of September 9, 1850 (9 Statute, 446, ch. 49,) and the subsequent act of February 24, 1863, (12 Statute 664, ch. 56.) organizing the territory of Arizona, the district courts of the latter territory were given the same jurisdiction in all cases arising under the constitution and laws of the United States as is vested in the circuit and district courts of the United States. It follows that as the circuit courts of the United States have jurisdiction over the crime of murder committed wi'h'n any fort, arsenal, or other place within the exclusive jurisdiction of the United States, so, prior to 1885, the district courts of a territory had jurisdiction over the crime of murder committed by any person other than an Indian upon an Indian reservation within its territorial limits, and that such jurisdiction has not been taken away by the legislation of that year. The first contention of petitioner therefore cannot be sustained."

This cause is decisive of the question of jurisdiction in this case, and would stand unquestioned, were it not for the later case of *U. S. v. Pridgeon*, 153 U. S. 48, 14 Sup. Ct. 746, which it is claimed is in conflict with this rule. We have examined the case critically, and can find no ground for this contention. Pridgeon was convicted of having committed the crime of horse-stealing in the Cherokee Outlet. That portion of the Outlet in which the crime was

committed was not within the boundaries of Oklahoma, but was attached to Logan county for judicial purposes. Embraced in the same order attaching this portion of the Outlet were portions of the Osage, Sac and Fox, Kickapoo and Iowa Indian reservations. The indictment charged that the larceny was committed in that portion of the Indian country attached to Logan county for judicial purposes, "which said part of said Territory was then and there Indian country, and a place and district of country then and there under the sole and exclusive jurisdiction of the United States of America." Inasmuch as horse-stealing was a crime under the United States statute in the Indian Territory, and was not a crime in Oklahoma Territory, it became necessary in the Pridgeon case to determine in what particular part of the attached country mentioned in the indictment the crime was actually committed. The court said: "This averment in the indictment has reference alone to the Cherokeee Outlet, for the Outlet was the only Indian country not included in Oklahoma Territory, embraced within the order of the supreme court, and was the only place and district of country attached to Logan county for judicial purposes that was under the sole and exclusive jurisdiction of the United States. The indictment may therefore be fairly construed as charging the offense as having been committed in that portion of the Cherokee Outlet attached to Logan county for judicial purposes." This is the only portion of the opinion in the Pridgeon case which can reasonably be claimed to in any manner modify or conflict with the law as laid down by Justice Brewer in the Wilson case. There is in fact no ground for such contention. The cases are in harmony, when properly understood. The claim that there is a conflict with the rule announced in the Wilson

case is based upon the erroneous contention that the United States can only punish crimes committed in some one of the places over which the federal government exercises sole and exclusive jurisdiction. The fallacy of this theory is made apparent by an examination of and reference to the provisions of the act of March 3, 1885, *supra*. By this act congress has given the United States courts jurisdiction over certain offenses committed by Indians on an Indian reservation within a state, while for all other purposes the state exercises jurisdiction in such reservations, and the sovereignty of the state is supreme, except as to these particular offenses. This act has been upheld and jurisdiction sustained by the supreme court of the United States. The same act also delegates to the Territory the jurisdiction over certain crimes committed by Indians on an Indian reservation within a territory, while the United States reserves to itself jurisdiction over offenses committed on such reservations by others than Indians. Again, while congress has extended the general laws of the United States over crimes committed on these reservations, the territories exercise certain portions of the sovereign power delegated to them by congress over the same reservations. The territory may by proper legislation create other offenses, and provide for their punishment when committed on an Indian reservation. It may also exercise any other governmental powers not in conflict with the constitution and laws of the United States. In the Pridgeon case the court, in making the statement that the portion of the Cherokee Outlet embraced within the order of the supreme court attaching certain Indian country to Logan county for judicial purposes was "the only territory embraced in the order within the sole and exclusive jurisdiction of the United

States," only stated a fact which was necessary to support the jurisdiction of the court in that case over the federal crime of horse-stealing, which was a crime peculiar to the Indian Territory, and did not attempt by such statement to announce a proposition of law. The territorial legislature is limited in the subjects respecting which it may legislate to such matters as are not inconsistent with the constitution and laws of the United States. Where congress has specifically legislated upon a particular subject, as, for example, the punishment of crimes on Indian reservations, the general laws of the Territory on the same subject, and creating similar crimes are inoperative in such reservations, because of being inconsistent with the laws of the United States, and congress by this limitation on the legislative powers of the Territory, witheld from the Territory the authority to legislate on such matters as congress had already made specific provision for.

All the cases cited by counsel in support of their contention that the United States courts have no jurisdiction over offenses committed in the Indian reservations are cases decided prior to the act of 1885, and relate to the jurisdiction of the United States courts sitting within the states. There is no room for question that the United States courts have no jurisdiction over offenses committed on Indian reservations within the boundaries of a state, unless such jurisdiction was reserved by some treaty stipulation, or was excluded from the state by the act admitting the state to the Union, as was done in the admission of the state of Kansas, unless such jurisdiction relates to crimes committed by Indians. And this class of cases have no application to the question under con-

sideration. The states are independent sovereignties, and exercises within the proper constitutional limits supreme power and authority. Each exercises exclusive power over its territory and its inhabitants, subject only to the powers delegated to the national government, and restricted by its own constitutional limitations. A territory has no inherent sovereignty. It is only a dependency of the United States government, under the exclusive jurisdiction and control of congress. All the powers it exercises are the powers of the United States, and are at all times subordinate and subject to the national authority and control. Its powers are all derived from congress, and are exercised under such limitations and control as congress may determine. Hence, there can be no conflict between the sovereign powers of the national government and the powers of a territory. The one is always subservient to and dependent on the other. The United States, in a strict sense, has and exercises sole and exclusive jurisdiction in the territories, because of the fact that the jurisdiction exercised by the territorial government is the exercise of a portion of that belonging to the United States, and exercised through its subordinate governmental agency, the territory. The power of congress to make any needful laws for a territory, or any portion of a territory, or for any particular class of its inhabitants, is not open to question.

In 1882 congress passed an act abridging the right of suffrage in the territory of Utah, (22 Statute, 30.) It was claimed that congress had exceeded its power, that the power to regulate the right of suffrage of its citizens belonged to the territory, and that the act was unconstitutional. The question came before the supreme court of

the United States in *Murphy v. Ramsey*, 114 U. S. 15, 5 Sup. Ct. 747; and Mr. Justice Matthews, speaking for the court said: "But that question is, we think, no longer open to discussion. It has passed beyond the stage of controversy into final judgment. The people of the United States, as sovereign owners of the national territories, have supreme power over them and their inhabitants. In the exercise of this sovereign dominion, they are represented by the government of the United States, to whom all powers of government over that subject have been delegated, subject only to such restrictions as are expressed in the constitution, or are necessarily implied in its terms or in the purposes and objects of the power itself; for it may well be admitted in respect to this, as to every power of society over its members, that it is not absolute and unlimited. But, in ordaining government for the territories and the people who inhabit them, all the discretion which belongs to legislative power is vested in congress; and that extends, beyond all controversy, to determining by law, from time to time, the form of the local government in a particular territory, and the qualifications of those who shall administer it. It rests with congress to say whether, in a given case, any of the people resident in the territory shall participate in the election of its officers or the making of its laws; and it may therefore take from them any right of suffrage it may previously have conferred, or at any time modify or abridge it as it may deem expedient. The right of local self-government, as known to our system as a constitutional franchise, belongs, under the constitution, to the states and to the people thereof, by whom that constitution was ordained, and to whom, by its terms, all power not conferred by it upon the government of the United States was expressly reserved. The personal and

civil rights of the inhabitants of the territories are secur-
ed to them, as to other citizens, by the principles of con-
stitutional liberty, which restrain all the agencies of gov-
ernment, state and national. Their political rights are
franchises which they hold as privileges in the legislative
discretion of the congress of the United States." The fore-
going is a clear and concise exposition of the relations of
the inhabitants of a territory to the national government,
and clearly shows that the reasons which exist for hold-
ing that a United States court cannot exercise jurisdic-
tion over the inhabitants of a state have no application to
the inhabitants of a territory.

It is suggested that the Organic Act, by implication,
repeals the act of congress extending the general laws of
the United States over crimes committed in the Indian
country, that by including these reservations within the
boundaries of Oklahoma, creating a local territorial gov-
ernment, and authorizing its legislature to legislate
upon all rightful subjects, congress intended that the
criminal laws of the Territory would extend to all
crimes committed upon these reservations. We do
not think this position tenable. The legislative
power does not extend to the right to repeal a
law of congress. There is nothing in the Organic Act
which in itself repeals the laws of the United States mak-
ing certain acts criminal when committed in the Indian
country, and it can only be by reason of the fact that the
legislature of the Territory has passed laws defining the
same offenses that it is claimed that such repeal is affect-
ed. There might be stronger grounds for this contention,
were it not for the fact that the legislative power of the
Territory is limited to all rightful subjects not inconsist-
ent with the constitution or laws of the United States.

It has always been the policy of the United States to retain control over Indians and Indian reservations, and, by extending the crimes act to the offenses committed on the Indian reservations, congress clearly expressed its purpose to retain this authority and control; and any law of the Territory which would have the effect to repeal the United States laws, and take from the United States courts jurisdiction over such crimes as are made penal by the United States statutes when committed on an Indian reservation, is inconsistent with the laws of the United States, and within th inhibition prescribed by the Organic Act. It would not be contended that, had the Oklahoma legislature never passed any laws making these same offenses criminal, and punishable under the laws of the Territory, the laws of the United States are not still effective for punishing such crimes when committed on the Indian reservations within the Territory. Repeals by im plication are not favored in law, and especially in this case, when the effect would be to repeal a prior particular act by a general law. The supreme court of the United States said in *Ex parte Crow Dog*, 109 U. S. 556, 3 Sup. Ct. 396: " 'The general principle to be applied.' said Bonet, C. J., in *Thorpe v. Adams*, L. R. 6 C. P. 135, 'to the construction of acts of parliament, is that a general act is not to be construed to repeal a previous particular act, unless there is some express reference to the previous legislation on the subject, or unless there is a necessary inconsistency in the two acts standing together.' " Applying this rule to the statutes under consideration, both must stand, for there is no express reference in the Organic Act to the statute extending the general laws of the United States to the Indian country, and there is no necessary inconsistency in the two acts standing togeth-

er.  An express act, conferring specific rights and pow-
ers, is held never to be repealed by implication, unless
the intent to effect such repeal is clearly expressed.
(*State v. Branin*, 23 N. J. Law, 484; *U. S. v. Berry*, 4 Fed.
785; *State v. Cornell*, [Neb.] 74 N. W. 59.)

If we were in doubt as to whether the United States
courts have jurisdiction of federal offenses when com-
mitted upon the Indian reservations in this Territory, we
should hesitate to reverse the general policy of the govern-
ment of the United States, in, for a long period of time,
exercising this jurisdiction in the territories.  "To justify
a departure from the general policy of the government as
declared by many statutes and decisions requires a clear
expression of the intention of congress." (*Ex parte Crow
Dog*, 109 U. S. 556, 3 Sup. Ct. 396.)

We are unable to discover any such clear expression
of congressional intent in this case.  Section 28 of the
Organic Act lends force to our theory of this case.  It
provides "that the constitution and all laws of the United
States not locally inapplicable shall, except so far
as modified by this act, have the same force and effect
as elsewhere within the United States; and all acts and
parts of acts in conflict with the provisions of this act
are, as to their effect in said Territory of Oklahoma, here-
by repealed."  We find nothing in the various provisions
of the Organic Act in conflict with the provisions of sec-
tion 2145, Revised Statutes, or that necessarily modifies
said section, and it cannot be reasonably contended that
section 2145 is locally inapplicable.  Upon the other
hand, it is especially and peculiarly applicable to the
conditions existing in this Territory at the time of its
creation, when more than three-fourths of its area con-

sisted of Indian reservations occupied by semi-civilized tribes, maintaining tribal relations, and dependent on the United States government for food and raiment. These persons were and still are wards of the government, and it is but highly proper that the general government should bear the public burden of executing the criminal laws upon these reservations.

. Our conclusion is that the United States court has jurisdiction of the crime charged in this case. Adultery is a crime under the laws of the United States, and, when committed on an Indian reservation within the Territory, should be prosecuted under the laws of the United States, and in the court having and exercising the jurisdiction of a United States court. We do not desire to be understood as holding, nor is it necessary to hold, that the United States exercises sole and exclusive jurisdiction over these Indian reservations. But, as said by Justice Brewer in the Wilson case, all acts which are made punishable by the laws of the United States when committed in any place over which the United States has sole and exclusive jurisdiction are likewise punishable when committed upon an Indian reservation in this Territory. Any act made criminal by the laws of the Territory, and not made a public offense by the statutes of the United States, the Territory unquestionably has the right to punish; and as to all other governmental matters not pertaining to Indians or their property the Territory may rightfully legislate. The United States still maintains exclusive jurisdiction over Indians in their tribal capacity, and over their lands, and only delegates to the Territory the power to enforce her criminal laws against them for certain offenses when committed either upon or off an Indian reservation.

It is next contended that the grand jury which returned the indictment in this case was not selected, drawn, and impaneled as required by law, and that the persons composing the grand jury were not qualified jurors. It will be remembered that the grand jurors were selected from the body of the Osage and Kansas Indian reservations, upon an open venire issued to the United States marshal upon an order of the judge of the district court. Section 9 of the Organic Act, among other things, provides: "Said Territory shall be divided into three judicial districts and a district court shall be held in each county in said district thereof by one of the justices of the supreme court, at such time and place as may be prescribed by law, and each judge, after assignment, shall reside in the district to which he is assigned. The supreme court shall define said judicial districts, and shall fix the times and places at each county seat in each district, where the district court shall be held, and designate the judge who shall preside therein. And the Territory not embraced in organized counties, shall be attached for judicial purposes to such organized county or counties, as the supreme court may determine." This section was afterwards amended to provide for five judges and five districts. Section 10 provides: "All offenses committed in said Territory, if committed within any organized county, shall be prosecuted and tried within said organized county, and if committed within territory not embraced in any organized county, shall be prosecuted and tried in the county to which such territory shall be attached for judicial purposes. And all civil actions shall be instituted in the county in which the defendant, or either of them resides, or may be found;

and when such actions arise within any portion of said territory, not organized as a county, such actions shall be instituted in the county to which such territory is attached for judicial purposes, but any case, civil or criminal, may be removed, by change of venue, to another county."

Under the authority granted by this act, the supreme court of the Territory made an order attaching all the territory embraced in the Osage and Kansas Indian reservations to Pawnee county for judicial purposes, and such order still remains in force. The Organic Act provides for a probate court in each county, and for justice of the peace courts. The territorial legislature has, under the limitations prescribed by congress, defined the jurisdiction of each of these courts, and adopted the procedure for them in both civil and criminal actions. The district court and courts of Pawnee county continued to exercise jurisdiction over all cases, civil and criminal, arising in the Osage and Kansas Indian reservations, until the adoption of the act of congress approved March 7, 1897, (Statutes First Session 55th Congress, p. 71, ch. 3.) This is the general Indian appropriation bill for the fiscal year ending June 30, 1898, and contains this provision: "And the justices of the peace and the probate courts in and for the Territory of Oklahoma, shall not have jurisdiction of any actions in civil cases against members of the Osage and Kansas tribes of. Indians, residing on their reservation in Oklahoma Territory, and the district court shall have exclusive jurisdiction in such actions, and at least two terms of such court shall be held in each year at Pawhuska, on said reservation, at such times as the supreme court of said Territory

shall fix and determine for the trial of both civil and criminal cases." After the adoption of this act the supreme court of the Territory ordered that a term of the district court be held at Pawhuska, commencing on the — day of November, 1897, and designated the judge of the Fourth Judicial district, (in which district Pawnee county is situated,) to preside at and hold such court. It was at the term of court held pursuant to this order that the plaintiff in error was tried and convicted. This act of congress makes it the duty of the district court to hold two terms of court per year at Pawhuska, in the Osage Indian reservation, "for the tr al of both civil and crimi al cases," and transfers to such court exclusive jurisdiction in all civil causes to which an Osage or Kansas Indian is a party defendant, and abolishes the jurisdiction of the probate courts and justices of the peace in all such cases. But it will be observed that the act makes no provision for any executive or clerical officers for such court, and fails to provide any means or method of procuring either grand or peitit jurors for such court, and makes no provision for compensation for them. The laws of Oklahoma make no specific provision for holding courts upon Indian reservations, and neither fix the qualications of jurors for such courts, nor provide any method for selecting them. The statute prescribing the qualifications of grand and petit jurors limits such jurors to "male citizens, residing in any of the counties of this Territory, having the qualifications of electors," etc. The inhabitants of these Indian reservations cannot be said to be residing in any of the counties of the Territory; nor are they "qualified electors," as they do not reside within any election or voting precinct or sub-division where an election may be

legally held under our laws. The machinery provided by our laws for selecting and drawing jurors is inapplicable to, and inoperative in, such Indian reservations as are not embraced within any organized county. Hence, no jurors can be selected for the Pawhuska district court from inhabitants of the reservations in the manner prescribed by our statute; nor are there any persons residing within said reservations having the qualifications of jurors, as defined in our laws.

But it is argued by counsel for the United States that by reason of these defects in our laws, and the conditions that exist in the reservations, the common law mode of selecting jurors may be resorted to, and that the action of the court in this case was had pursuant to common law practice and procedure. In support of this contention we are cited to the following provisions of our statute. Section 2 of Code of Civil Procedure provides: "The common law, as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of Oklahoma; but the rule of the common law that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of Oklahoma, but all such statutes shall be liberally construed to promote their object." Section 15 of "Procedure—Criminal" is as follows: "The procedure, practice, and pleadings in the district courts of this Territory in criminal actions or in matters of a criminal nature, not specially provided for in this chapter, shall be in accordance with the procedure, practice, and pleadings of the common law, and assimilated, as near as may be, with the procedure, practice, and pleadings of the United

—10

States or federal side of said court." Our district courts are courts of common law jurisdiction, and under the foregoing statutory provisions may resort to the common law in any matter of practice where the statutory method of procedure is inapplicable, or in any case where specific provision is not made for the practice by the statutes. And in this case we think the method adoped by the court in procuring the jurors was in accordance with the common law method, and was authorized both by the common law and our statute.

But, notwithstanding that the method of procedure followed was not contrary to law, was a common law jury obtained by this process? Sir William Blackstone says:

"When, therefore, a prisoner on his arraignment has pleaded not guilty, and for his trial hath put himself upon the country, which country the jury are, the sheriff of the county must return a panel of jurors, '*liberos et legales homines de vicineto*'; that is, 'free-holders, without just exception, and of the visne or neighborhood,' which is interpreted to be of the county where the act is committed." (4 Bl. Comm. 350.)

We take judicial notice of the fact that there are no free-holders residing within the Osage and Kansas Indian reservations, and under the law there are no qualified common jurors in such reservations; and hence the grand jury which returned the indictment in this cause, and the petit jury which returned the verdict against her, were not qualified jurors, and the challenge to the panel in each instance should have been sustained.

We are asked to determine how the court created by the act of March 7, 1897, is to execute the laws when sitting at Pawhuska, as it is given jurisdiction to try both

civil and criminal causes. In our judgment, congress did not intend to repeal the law authorizing that the Indian reservations should be attached to an organized county for judicial purposes, but intended to abolish the jurisdiction of the probate and justices' courts in causes where Indians should be sued or prosecuted, and to modify and supplement that act by the later one and that both should be construed together. The probate courts and justices' courts of Pawnee county still have jurisdiction of all causes and matters of which they had jurisdiction prior to the passage of the act of 1897, except causes where members of the Osage or Kansas Indian tribes are defendants. This class of cases must all be tried in the Pawhuska district court. The only purpose of this act was to provide a court where the Indians could have their rights litigated on their own reservations, without being compelled to go to a distant place, among strange people, to attend court. And in carrying out this purpose congress provided this court, and conferred upon it the authority to hear all causes, civil and criminal, that may arise in these reservations, in which members of these Indian tribes are either sued or prosecuted. In view of the existing order of the supreme court attaching the Osage and Kansas Indian reservations to Pawnee county for judicial purposes, and construing this order, the provisions of the Organic Act and the act of 1897 in *pari materia*, and interpreting all these provisions as we view the purposes of congress, it would, as a whole, appear as if reading thus: "All offenses committed in said Territory, if committed within any organized county, shall be prosecuted and tried within said county, and, if committed within the Osage and Kansas Indian reservations, shall be prosecuted and tried

in Pawnee county, to which such reservations are now attached for judicial purposes. And all civil actions shall be instituted in the county in which the defendants, or either of them, resides or may be found; and, when such actions arise within the Osage and Kansas Indian reservations, such actions shall be instituted in Pawnee county, but any case, civil or criminal, may be removed by change of venue to another county: provided, that the justices of the peace and the probate courts in and for the Territory of Oklahoma shall not have jurisdiction of any actions in civil cases against members of the Osage and Kansas tribes of Indians residing on their reservations in Oklahoma Territory, and the district court shall have exclusive jurisdiction in such actions, and at least two terms of such court shall be held in each year at Pawhuska, on said reservation, at such times as the supreme court of said Territory shall fix and determine, for the trial of both civil and criminal causes."

Thus read and construed, it seems clear that congress only intended for the Pawhuska court to have jurisdiction of causes in which resident members of the Osage or Kansas Indian tribes are parties defendant. The act of 1885, heretofore referred to, gave the district court, as a territorial court, jurisdiction of all offenses committed by an Indian on or off an Indian reservation within a territory, and that act should be kept in mind when construing the provisions of the several acts relating to the jurisdiction of courts in Oklahoma. We think it clear that the jurisdiction of the Pawhuska court is confined to those causes, civil or criminal, in which resident members of the Osage or Kansas Indian tribes are parties defendant, and that as to all other causes arising within these reservations, either civil or criminal,

the jurisdiction remains in the district, probate and justices' courts of Pawnee county. As thus interpreted the law would confer jurisdiction of no United States causes upon the Pawhuska court, except crimes committed by Indians, and not enumerated in the particular offenses in the act of 1885, to-wit, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny, all of which are triable as offenses against the Territory when committed by an Indian either on or off a reservation. All persons other than Indians violating the penal laws of the United States within said reservations are triable in the United States district court for Pawnee county, and persons other than Indians committing offenses against the laws of the Territory are triable in some one of the courts of said county. And as the Pawhuska court only has jurisdiction of Indian defendants, and an Indian is only triable under the laws of the Territory for the crimes enumerated in the act of 1885, *supra*, it follows that the federal jurisdiction of the Pawhuska court is limited to offenses committed by Indians, and not enumerated in the act of 1885. If this construction of these several acts is correct, it follows that the district court at Pawhuska had no jurisdiction of the offense charged against the plaintiff in error in this case. It being conceded that she is a white person, she should have been tried by the district court of Pawnee county, exercising the jurisdiction of a United States court.

As congress made no specific provision for officers or jurors for the Pawhuska court, we must conclude that the laws of the Territory were to be used in aid of the act of congress, and that the officers whose duty it is to attend upon the district court within Pawnee county, and the jurors provided for the courts of that county, would be

available for officers and jurors in the new court. As it is now provided for holding a term of the district court at two places within what we may term one judicial county, each court to try certain specified cases arising within such judicial county or sub-division, we see no reasonable objection to the sheriff and county attorney of Pawnee county performing the services in the Pawhuska court required of such officers in the court when held at Pawnee, or to taking the jurors for the Pawhuska court from the jury lists prepared in said county for jurors in the courts of Pawnee county. Pawnee county and the Osage and Kansas Indian reservations are in one judicial sub-division, and for all judicial purposes constitute practically one county, and we can see no objections to taking jurors from one part of a judicial jurisdiction when the persons in the other part are disqualified to serve as jurors. Pawnee county levies taxes upon the persons and property liable for taxation within these reservations, and collects therefrom à court expense fund, which is applicable to the payment of jurors' per diem and mileage, and such other expenses of the court as a county may be liable for. The county also collects from the same source a fund for county officers' salaries, and the sheriff and county attorney are authorized to take into consideration the inhabitants of the Indian reservations in fixing the basis for determining the amount of their salaries. However, the costs and expenses incident to the trial of certain offenses committed by Indians the United States is required to pay; and the county would, in any event, be relieved of the payment of costs incurred in these particular cases. By section 11, Act March 2, 1889, (25 Statute 980,) it is provided "that hereafter the costs of the trial of the cases in the courts of

the several territories tried pursuant to and for the offenses named in section nine of the act entitled 'An Act Making Apropriations for the Current and Contingent Expenses of the Indian Department, and Fulfilling Treaty Stipulations with Various Indian Tribes for the Year Ending June Thirtieth, Eighteen Hundred and Eighty-six, and for other purposes' shall be audited by the accounting officers of the treasury, and paid out of any money for similar expenses in the trial of criminal cases in the courts of the United States." The crimes here referred to, the costs of which the United States are required to pay, are murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny; and when an Indian is tried for either of these offenses in the courts of the Terrtiory the court should order the costs to be paid by the United States, as similar costs are paid in other prosecutions by the United States. As these offenses include those which usually require lengthy trials, and cause heavy expense to be incurred, congress has seen proper to relieve the local authorities in the territories of the burdens incident to such trials.

We think it may properly be said that the court at Pawhuska is but a division of the district court for the territorial jurisdiction consisting of Pawnee county and the Indian country attached thereto for judicial purposes, and when holding its sessions at Pawhuska the same officers are required to attend upon it, and perform therein the same class of duties required of them when in attendance upon the division of such court holding its sessions at Pawnee, the county seat of Pawnee county. And the persons whose names are selected in the manner provided by law, and placed in the jury box for jurors in Pawnee country, are qualified jurors for the court when

sitting at Pawhuska, and should be drawn and sum-
moned in the same manner as the jurors are drawn and
summoned for the Pawnee district court, and their at-
tendance may be enforced as if summoned to attend at
the county seat of Pawnee county.

It is next contended that the jury in this case was illegal
because the venire was served by the United States mar-
shal instead of the sheriff.   It is true the statutes of Okla-
homa do not authorize the marshal to serve a venire.   But
the Organic Act provides that the marshal shall execute
all process for the court, when exercising its jurisdiction
as a United States court, and this act controls the statu-
tory provisions.   It is not only proper, but the court
should require the marshal to execute its orders, writs,
and process when performing the functions of a United
States court.

It is further claimed that the trial court erred in over-
ruling defendant's motion for a continuance.   The indict-
ment was returned on the afternoon of the first day of the
term, and the defendant was arraigned and required to
plead the following morning.   She pleaded not guilty, and
the United States attorney announced, "Ready for trial."
She requested time to subpoena her witnesses, and made
application for a continuance on account of absence of
five witnesses.   The United States attorney admitted that
three of the absent witnesses, if present, would testify as
alleged in her affidavit for continuance; and the court
overruled the motion, and compelled her to go to trial.
The constitution guarantees to every person accused of
crime the right to have compulsory process for obtaining
witnesses in his favor, and to have the assistance of coun-
sel for his defense.   To compel a defendant charged with

a felony to go to trial before an officer could, with reasonable haste, serve the process issued for her witnesses, is a denial of this constitutional right to have compulsory process for her witnesses. One accused of crime is entitled to have the witnesses in his behalf present, if with reasonable diligence they can be obtained, and is entitled to reasonable time within which to procure them. If they are not obtained after reasonable time given, and diligence exercised, then the court may, in the exercise of a sound discretion, require the accused to go to trial on the admission of the prosecutor that they will testify as alleged by the accused. Such haste in forcing to trial one charged with a felony as was manifested in this cause was clearly in violation of the substantial rights of the accused.

There are a number of other alleged errors, but it is unnecessary to review them here, as the cause must be retried. The judgment of the district court is reversed, and cause remanded to the district court at Pawhuska, with directions to set aside the indictment and remand the defendant to the custody of the United States marshal to await the action of the United States grand jury in the district court of Pawnee county, and that she be held to answer said charge, and said charge be resubmitted to the grand jury at the next following term of the district court for Pawnee county, and, if again indicted, that she be tried for said offense, unless said cause shall be otherwise disposed of by counsel for the United States.

All the justices concurring fully, except Tarsney, J., who concurs in the result, and in the reasoning and conclusions upon all the propositions involved, except the first proprosition discussed in the opinion. Upon this proposition he withholds his assent.